[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-11474

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 6, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-00376-CR-BBM-1

UNITED STATES OF AMERICA,

                                                        Plaintiff-Appellee,

versus

DONALD FRANK SMITH,

                                                        Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 6, 2009)

Before BIRCH, HULL and FAY, Circuit Judges.

PER CURIAM:

   After a jury trial, Donald Frank Smith was convicted of possessing a firearm

as a convicted felon, in violation of 18 U.S.C. § 922(g), and sentenced to 120

months in prison.  He appeals his conviction and sentence.  After review and oral argument, we affirm his conviction but vacate his sentence and remand for re-sentencing.

## I.  BACKGROUND

**A.  Smith's Arrest; State and Federal Charges**

On August 5, 2006, Smith was arrested by Atlanta police.  Smith's arrest stemmed from a fight between Smith and Atlanta police officer Matthew Henderson.  Officer Henderson was called to the scene after Nadia Boothe called police and reported that a man (Smith) had grabbed and threatened her in the parking lot of a gas station.  When Officer Henderson arrived, Smith was boarding a bus.  Officer Henderson stopped the bus and escorted Smith off the bus.  When Officer Henderson attempted to arrest Smith, Smith tried to run and a fight ensued in which both men were hurt.  Smith allegedly clubbed Officer Henderson with a gun.  Officer Henderson eventually subdued Smith.  When other officers arrived they found a .38 caliber handgun at the scene.

Smith, who previously had been convicted of a felony, was charged in state court with aggravated assault on a peace officer, possession of a firearm during commission of a felony, possession of a firearm by a convicted felon, attempted kidnaping, boarding a bus with a concealed weapon, reckless conduct, and giving

false information to a law enforcement officer.[1]  In addition to the state charges,

Smith was indicted in federal district court on September 6, 2006 for possession of

a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g).

## B.     Pretrial Motions

Smith pled not guilty and moved to suppress evidence and statements

obtained by police in the case.  Smith argued that his stop, detention, seizure, and

arrest by Officer Henderson was warrantless and without probable cause.  Smith

also moved to suppress all statements that he allegedly made to police, arguing that

they were not made voluntarily and were obtained in violation of Miranda.[2]  Smith

later filed a pro se motion to dismiss for violation of the Speedy Trial Act.

The magistrate judge held an evidentiary hearing and issued a report

recommending that Smith's motions to suppress and to dismiss be denied.  The

magistrate judge recommended denying the motion to dismiss because it was filed

pro se and Smith was represented by counsel.  The magistrate judge recommended

denying the motions to suppress because (1) Officer Henderson's investigatory

---

[1]In November 2007, a state court jury found Smith guilty of aggravated assault on a
police officer, obstruction of a law enforcement officer, possession of a firearm during the
commission of a felony, boarding a bus with a concealed weapon, and giving false information
to a law enforcement officer.  The state court sentenced Smith to twenty years' imprisonment for
aggravated assault, followed by ten years' probation for boarding a bus with a concealed
weapon, and suspended the sentences for the other offenses.

[2]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

stop and detention of Smith was supported by reasonable suspicion, (2) the events after the investigatory stop warranted Smith's arrest, and (3) Smith's statements to police were voluntary and not obtained in violation of Miranda or the Fourth Amendment. The district court accepted the report and recommendation as to the motions to suppress and denied them.

At the pretrial conference on September 5, 2007, the district court denied Smith's motion to dismiss for a Speedy Trial Act violation (along with two other pro se speedy-trial-based motions to dismiss, which Smith filed after the magistrate judge's report). On September 11, 2007, Smith's counsel filed a motion to adopt the pro se motions to dismiss. The district court permitted the adoption, but denied the counseled motion to dismiss.

## C. Trial Testimony

The district court held a jury trial from September 12 to 14, 2007. Because Smith challenges the sufficiency of the evidence to support his conviction, we detail the testimony of the witnesses at trial.

### 1. Government's Case-in-Chief

Nadia Boothe, the government's first witness, testified that on August 5, 2006, her husband was driving her to work shortly before 4:00 p.m. She was sitting in the front passenger seat. They stopped at a gas station. When they were

4

pulling out, they saw Smith walk in front of their car and stare at them in a "menacing" way. Boothe asked him "was everything all right, did he need anything." Smith said, "What did you say?" and walked up to the car. Smith then leaned through the open passenger-side window and grabbed Boothe in the groin area. Smith tried to snatch an unlit cigarette out of her hand, and he also was "trying to grab [Boothe] out of the car." Boothe told Smith to get away from her, and her husband drove them away from Smith. Smith followed their car on foot; Boothe testified that Smith was "chasing us with, like, his hand on his hip like he has a gun and saying that he spared us and saying all kinds of smart things to us." Boothe did not see Smith have any gun at that time, though.

Boothe's husband drove to another gas station further down the street, and Boothe called 911. While Boothe was outside the second gas station making the call and waiting for police, Smith walked past her into the gas station's store "and he was still saying smart little stuff, basically kept saying that he had spared us and things of that nature." Boothe waited for a police officer for 30 minutes before giving up and going to work.

Boothe worked at a Church's Chicken restaurant a few minutes down the road. After working for an hour or two, Boothe noticed that Smith was in the restaurant. Boothe had not seen him come in. Smith approached the counter and

5

asked her for hot sauce. Smith was wearing totally different clothing, but Boothe recognized him. Boothe called 911 again. Smith went out to a bus stop, and five minutes later a policeman (Officer Henderson) arrived. Boothe pointed out Smith to Officer Henderson.

At that time, Smith was getting onto the bus. Boothe saw Officer Henderson stop the bus, enter it, and escort Smith off the bus. Then she saw Officer Henderson "attempt to arrest" Smith, and Smith resist. Officer Henderson grabbed Smith by the back of the shirt and Smith "started attacking" Officer Henderson. Officer Henderson drew his baton and they fought; during the fight they fell to the ground. Boothe saw Officer Henderson on the ground, and Smith was on top of him "beating him with a gun." The gun was silver, "shaped like a gun basically" and "looked like a gun." Smith hit Officer Henderson with the gun repeatedly, and Officer Henderson had blood all over his face and dripping down his shirt. Officer Henderson got to his knees and radioed for backup. Boothe ran to Officer Henderson's car and also tried to call for help. When she went to the car, Boothe was not watching the fight.

The fight lasted a few minutes, and at the end Officer Henderson had handcuffed Smith. A few minutes after the fight stopped, another police officer arrived. Until that time, no one approached Officer Henderson and Smith. Shortly

6

after the second officer arrived, a number of other police officers came as well.

The government also called Officer Henderson to testify. Officer Henderson testified that on the afternoon of August 5, 2006, he received word from a dispatcher sending him to a "dispute call" at Church's Chicken and directing him to see Boothe. When he arrived, Boothe told him that the man at the bus stop tried to grab her. She pointed out Smith. Smith got onto the bus, and Officer Henderson ran to the bus and stopped it to speak to Smith. Officer Henderson told Smith to leave the bus, and they exited. After Officer Henderson got off the bus, he testified that the "[n]ext thing that I can remember is I feel this burst of pain in my head, it's extreme pain, and . . . then I'm covered in my blood." Officer Henderson felt like he was hit with a blunt object right at his hairline on the front of his head, but he had "no idea what the object was that caused the pain." His memory is unclear after that, but he was struggling physically with someone and at some point he was lying on the ground and radioed to his dispatcher that he had someone in custody, was bleeding, and needed an ambulance. The next thing Officer Henderson remembered was someone applying pressure to his head and then waking up at the hospital.

The next witness was the bus driver, Joe Terry Cole. Cole testified that when Smith and Officer Henderson got off the bus, there was a "commotion."

7

Cole thought one of the men was falling and the other was trying to catch him, then one (Smith) was trying to run and the other (Officer Henderson) was trying to hold him. Then he saw the men on the ground fighting. Cole "definitely" saw a shiny object in Officer Henderson's hand, with which Officer Henderson was trying to strike Smith, but no other objects or weapons. Cole stated he did not know whether he saw Smith's hand or not, because he was not looking for anything in particular.

Atlanta police officer David Somers testified that he responded to Officer Henderson's request for help. He found Officer Henderson and Smith on the ground in some grass near a house, with Smith's hands behind his back and Officer Henderson's arms and legs wrapped around Smith to hold him down. Somers "took [Smith] off" of Officer Henderson to cuff him and found Smith already cuffed. Somers turned to Officer Henderson and Smith got up on one knee, saying "I can't stay here. I've got to go. I've got to get out of here. I can't go back." Somers put him down and ordered him to stay, but Smith got up again, reiterating that he had to go and could not go back. Somers put his knee on Smith to keep him from getting up. After five minutes, other police units arrived and took charge of Smith. During this time, Officer Henderson did not speak at all, even though Somers repeatedly asked him what was going on. Officer Henderson's entire face

8

was covered with blood.  Smith was covered in blood too, but Somers did not see any injuries on Smith.

Somers testified that Officer Burt Brooks was one of the officers who arrived at the scene.  Brooks "stopped right in front of the bus stop, and as soon as he stepped out of [his] vehicle, [said], 'Who does this gun belong to?'"  Somers testified that "right where Officer Henderson is and the gun, it's like a long – it's just a straight line [from where Brooks found the gun] to where I found Officer Henderson."  There were no civilians in the grassy area, and no one was trying to help Officer Henderson when Somers arrived.  There were a group of people at the Church's Chicken across the street watching.

Officer Johnny Leblanc testified next.  Officer Leblanc was the responding officer who wrote up the police report for the incident.  He arrived as other officers were getting there and he made a perimeter with crime scene tape.  No civilians came inside the taped-off area.  He looked around in the grassy area for evidence.  At first neither he nor the other officers located any evidence there.  Leblanc testified that, between five and ten minutes after he arrived, "it was brought to my attention and the attention [of] other officers that there was a revolver [lying] on the grass which wasn't initially noticed by any of us."  At that time, there were ten to twelve officers present.  Someone said, "What's that?" and pointed out the

9

weapon on the ground. Leblanc turned and saw the weapon, which was a dark gray revolver. No one moved the gun until the I.D. tech arrived and photographed it. Officer Leblanc took Boothe's statement and asked if any of the civilians present had seen the fight, but no one came forward. Leblanc testified that he saw "debris" in the grassy area, but no other "weapons or rocks or bricks or anything." On cross-examination, Leblanc stated that about seven or eight officers were looking around the area for evidence by the time the gun was found, and they had been looking for "a couple of minutes" before finding it.

Atlanta police investigator Eric Anderson testified that he collected evidence at the scene. He tagged and bagged the gun and the items off Smith's person. Anderson did not see any bricks, rocks, or blunt objects other than the gun in the general area; he also did not find any electronics. On cross-examination, Anderson testified that he did not request any fingerprint analysis of the gun.

The government called Thomas Hopen, a forensic investigator with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("B.A.T.F."). Hopen tested the gun found at the scene. His tests did not reveal any traces of blood on the gun. He was not able to express an opinion about whether or not the gun was used to hit someone in the head.

B.A.T.F. special agent Steve Kosch testified as an expert as to the interstate

10

movement of the gun. Kosch testified that the gun matched the legal definition of a firearm and that he examined it to see where it was manufactured. He examined the markings on the gun, consulted research materials, and determined the gun was manufactured in Massachusetts by Smith & Wesson. Smith & Wesson does not have any manufacturing plants in Georgia. Kosch opined that the weapon had to travel in or affect interstate commerce to be present in Georgia. He also reviewed a trace report for the gun and testified that the gun was sold to its original purchaser (Loren Keith Burt) in St. Louis, Missouri in July 2001. The trace report listed the last firearms dealer to sell the gun, but did not contain information about potential sales from one private citizen to another.

2.    Defendant Smith's Evidence

Smith called Alfonso Kennedy, a fourteen-year-old boy who lived in a house near the Church's Chicken and witnessed the fight between Smith and Officer Henderson from his front porch, where he was sitting with his cousin Marino. Kennedy testified that after Officer Henderson pulled Smith off the bus, Smith "tried to get loose, then they ended up in the grass and they was on the ground fighting." According to Kennedy, the two men "was hitting each other. Then the police officer whipped out his little stick and starting beating [Smith] in the head. . . . They was still going at it and then [Officer Henderson] finally got

11

[Smith] in handcuffs and then he started calling for back-up and then some more police officers came down." Kennedy said he saw the whole thing and Smith never had anything in his hands. He stated that when the other police officers arrived one of them kicked Smith and another picked him up and dropped him.

On cross-examination, Kennedy testified that the fight started because Smith was trying to get away from Officer Henderson. He testified that Smith swung at Officer Henderson one time, but did not hit him. At some point Officer Henderson fell in the grass.

Kennedy's grandmother Diane Kennedy also testified for Smith. She did not see the fight because she was inside when her grandson Marino told her to come look. The fight was over by the time Ms. Kennedy reached her porch. Ms. Kennedy testified that when the police officers arrived after the fight, they picked Smith up, dumped him down, and started kicking and hitting him with "something like a stick or iron or something."

## D.    Exclusion of Marino Simon

After Ms. Kennedy testified, the defense called Marino Simon, Kennedy's cousin and Ms. Kennedy's other grandson, to testify. The government objected to Simon's testimony on the ground that Simon violated the rule of sequestration, which the government invoked at the beginning of the trial. The government

asserted Simon had spoken to Kennedy about the testimony Kennedy had given.

The district court and counsel questioned Simon about the alleged violation outside the presence of the jury. Simon indicated that Kennedy had spoken to him outside the courtroom after Kennedy had finished testifying. Simon stated that Kennedy did not mention his testimony, but that they had just talked about lunch and "things at school."

The district court and counsel then had Kennedy come back to the courtroom to testify further, but outside the presence of the jury. Kennedy stated that Simon asked him what went on in the courtroom during his testimony, but that Kennedy did not tell him. Next, Simon said he was hungry, and Kennedy said he was too. After denying it, Kennedy then admitted that he told Simon that Kennedy had testified that he saw the fight.

The district court and counsel then examined a government rebuttal witness, Amy Michalik, who testified that she overheard Kennedy tell Simon that he had testified that the two of them were sitting on the porch, and that the two of them spoke more quietly for a moment when she approached. She could not make out what they said after that. After hearing this testimony, the district court concluded that Kennedy and Simon violated the rule of sequestration, and excluded Simon from testifying.

Smith's counsel then made a proffer of what he expected Simon's testimony

to be:

> I expect that he will testify that he was in fact sitting on the porch with his cousin, that they were listening to music and that he witnessed the whole fight. He saw the bus pull up in front of the neighboring yard . . . , that he saw, in essence, shortly after the two gentlemen get down to the street that a fight erupted between the two of them where they were swinging at each other, that there was – that [Smith] did not display or show or have anything in his hands, that ultimately the – he and the officer found themselves down on the ground wrestling, punching each other, and ultimately he ended up in handcuffs and that both of the individuals appeared to sustain injuries as both people were bloody in the aftermath and that both people were taken away, taken away by ambulances, obviously, apparently because they needed medical treatment.

Later, the district court made the following statement about its exclusion of Simon:

> Mr. Simon was never sworn. It was stated to me that Mr. Simon and Alfonso Kennedy were seen talking together after Mr. Kennedy had testified. And I know that they were not supervised . . . , so they were out there without supervision, I guess, while their grandmother was testifying. And I have the sworn testimony of Agent Michalik, stat[ing] that she had overheard Mr. Kennedy telling Mr. Simon what his testimony had been. And when I asked Mr. Kennedy if he had discussed his testimony with Mr. Simon, ultimately his answer was, quote, not really. He's 14 years old and he was probably scared to death, but he did not make eye contact with me during my discussion with him and he would click his tongue up against the top of his mouth. And I'm not commenting on his credibility as a witness in this case. I'm just talking specifically about my conversation with him about whether he had discussed his testimony with Mr. Simon. There were three people involved. Mr. Simon said he did not discuss Mr. Kennedy's testimony. Mr. Simon, again, was never sworn. I've got the sworn testimony of M[s]. Michalik saying that she did hear the young men discussing Mr. Kennedy's testimony. And then I've got

14

the testimony of Mr. Kennedy saying, not really, when I asked him if they had discussed his testimony. And so it's on the record that I made the ruling that I did.

## E.  Exclusion of Treatment Note Testimony

At trial, Smith's counsel informed the district court that Smith intended to call a hospital nurse that treated Officer Henderson. The government objected based on hearsay.

Smith's counsel argued that because the hospital records are business records, the nurse could testify "that to the extent that there are doctor's notes or progress notes [in the hospital's medical records] pertaining to the night, that very night she was treating Mr. Henderson, that she is also capable of testifying, for instance, to a progress note saying that Mr. Henderson thought that he was hit with a C.D. player." The district court ruled that the nurse could testify about entries she made arising from what Officer Henderson himself told her for diagnosis or treatment purposes. However, the court ruled the nurse could not testify as to entries arising from statements Officer Henderson may have made to the ambulance's emergency medical technicians or other medical personnel that the nurse received secondhand.

Smith ultimately did not call the nurse. However, he did make a proffer of the testimony he expected to elicit had the government's hearsay objection not

15

been sustained.  Smith's counsel stated:

> [W]hat she was going to testify to is that she saw Officer Henderson. She helped treat him.  In essence, she created the emergency trauma nursing notes that particular night.  They're a three-page document, and . . . those [notes] indicate that Officer Henderson was hit with a rock, that she will testify that essentially those documents are documents that are maintained in the ordinary course of business there at Grady Hospital.  They are documents that are filled out every time a patient comes into the emergency [room].  Moreover, she would testify regarding other doctors' notes and an intake note, and in those doctors' notes and intake notes there are indications, again, that . . . Officer Henderson was hit with a brick and a rock, and then a different place that he was hit with either a C.D. player – or thought he was hit with a C.D. player or a gun that was found at the scene.

The district court reiterated its ruling "that I did not exclude her altogether.  I just . . . said she could testify to hearsay to the extent of what Officer Henderson told her. . . .  It's just that what Officer Henderson told somebody else who told her that I excluded."  Smith's counsel responded that the nurse "would have testified if she took the stand that her emergency trauma notes most likely reflected conversations that she would have had with E.M.T.'s who transported Officer Henderson to the hospital."  He also indicated that the nurse would have testified as to doctor's progress notes that "would likely reflect the conversation that Officer Henderson was having with the doctor himself at that point."

The district court asked whether Smith intended to call the doctor.  Smith's counsel said yes.  The government also indicated it had planned to call the doctor,

16

but that the doctor "doesn't know where that information came from in the doctor's notes either" and therefore the government did not call the doctor to testify. Smith's counsel gave no response to this statement.

## F.     Verdict and Sentencing

After the government rested, and again at the close of all evidence, Smith moved for a judgment of acquittal, arguing that the evidence was insufficient to establish that Smith possessed the gun or that an interstate nexus existed with respect to the gun. The district court denied the motion both times. At the conclusion of the trial, the jury found Smith guilty.

The federal probation office calculated Smith's base offense level at 20 pursuant to U.S.S.G. § 2K2.1. Smith qualified for a four-level increase pursuant to § 2K2.1(b)(6) because he used a weapon in connection with another felony offense (Smith's state charge of aggravated assault). Smith also qualified for a two-level increase pursuant to § 3A1.2 because the offense involved an official victim, Officer Henderson. Therefore, Smith's total offense level was 26 which, with a criminal history category of VI, yielded an advisory guidelines range of 120 to 151 months' imprisonment. The probation office adjusted Smith's advisory guidelines range to 120 months' imprisonment because the statutory maximum period of imprisonment for Smith's offense was ten years.

The district court conducted a sentencing hearing on March 20, 2008. As mentioned above, Smith was convicted in state court for his conduct on August 5, 2006. Smith was sentenced to 20 years in prison on his state aggravated assault conviction. The district court determined that U.S.S.G. § 5G1.3(b) required Smith to be sentenced concurrently with his state aggravated assault sentence. Smith's attack on Officer Henderson was relevant conduct to Smith's federal § 922(g) offense and was used to increase Smith's offense level.

After considering the 18 U.S.C. § 3553(a) factors, the district court imposed a 120-month sentence of imprisonment, to run concurrent with Smith's 20-year state sentence. After the district court announced the sentence, Smith's counsel requested that the court credit Smith with the time he already had served on his state sentence, pursuant to U.S.S.G. § 5G1.3(b)(1). The government objected. The district court concluded that § 5G1.3(b)(1) required a sentence adjustment for time served in state prison only if the federal Bureau of Prisons will not credit the time served. The district court further concluded that it could not determine, and would not attempt to anticipate, what time the Bureau of Prisons would credit to Smith's federal sentence. Thus, the district court denied Smith's request to credit him with time served on the state aggravated assault sentence.

Smith appealed his conviction and sentence.

18

## II. DISCUSSION

### A. Speedy Trial Violation

Smith first argues that the district court erred in denying his motions to dismiss for speedy trial violations.[3] The Speedy Trial Act requires that the trial of an indicted defendant shall start within seventy days of the later of the defendant's indictment or arraignment. 18 U.S.C. § 3161(c)(1); United States v. Young, 528 F.3d 1294, 1295 (11th Cir. 2008). However, certain days are excluded from the seventy-day calculation. Those include "[a]ny period of delay resulting from other proceedings concerning the defendant, including . . . delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" and "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court." 18 U.S.C. § 3161(h)(1)(D), (h)(1)(H).[4]

---

[3]"This court reviews de novo the district court's denial of a criminal defendant's motion to dismiss based upon his Sixth Amendment right to a speedy trial or the Speedy Trial Act." United States v. Harris, 376 F.3d 1282, 1286 (11th Cir. 2004) (citations omitted). However, we review the district court's factual determinations for clear error. United States v. Ingram, 446 F.3d 1332, 1336 (11th Cir. 2006); Harris, 376 F.3d at 1286.

[4]Effective October 13, 2008, Congress amended § 3161 by deleting obsolete cross-references to the Narcotic Addict Rehabilitation Act. See Judicial Administration and Technical Amendments Act of 2008, Pub. L. No. 110-406, 122 Stat. 4291, 4294. The amendment repealed the former § 3161(h)(1)(B)-(C), which are not relevant here, and re-designated subparts (D) through (J) of § 3161(h)(1) as § 3161(h)(1)(B)-(H). Id. In this opinion, we provide the new citations.

Additionally, in <u>United States v. Davenport</u>, 935 F.2d 1223 (11th Cir. 1991), this Court explained that the excludable time regarding pretrial motions continues through a post-hearing briefing period until 30 days after the court takes the matter under advisement, stating as follows:

> [T]he court may provide a period of time following the hearing during which parties may submit supplemental materials regarding the motion. This period of time is automatically excluded without regard to its reasonableness. Once the court concludes the hearing and the time for filing supplemental materials expires, the court has taken the motion under advisement and [§ 3161(h)(1)(H)] permits no more than thirty additional days to be excluded from the speedy trial clock.

<u>Davenport</u>, 935 F.2d at 1228-29 (citations omitted). In addition, when a magistrate judge considers a pretrial motion and issues a report, and then the district court considers whether to accept the report, both judges have thirty days of excluded time in which to consider the motion. <u>United States v. Mers</u>, 701 F.2d 1321, 1335-37 (11th Cir. 1983). Also excluded is "[a]ny period of delay resulting from a continuance granted by any judge" upon a finding that the ends of justice served by the continuance outweigh the interests of the public and the defendant in a speedy trial. 18 U.S.C. § 3161(h)(7)(A).[5]

---

[5]If the defendant's trial is not commenced within the seventy-day period, "the . . . indictment shall be dismissed on motion of the defendant." 18 U.S.C. § 3162(a)(2). Whether the dismissal is with or without prejudice depends on such factors as the seriousness of the offense with which the defendant is charged, the facts and circumstances that led to dismissal, and the impact of a re-prosecution. <u>Id.</u>

As to excludable time, Smith does not provide his own calculation or state with specificity which days the district court should not have excluded. Instead, he argues merely that "the [district court's] calculation excluded over seven months of time solely related to the disposition of Mr. Smith's motions to suppress evidence and statements." Because Smith's argument focuses on the time excluded as to his motion to suppress, we review what happened with the motion to suppress and explain why the district court properly excluded the time between October 12, 2006 and July 16, 2007.[6]

First, Smith's motion to suppress was filed on October 12, 2006 and required a hearing. Thus, the time between the October 12, 2006 motion and the January 8, 2007 hearing was excludable on that basis alone. See United States v. Phillips, 936 F.2d 1252, 1254 (11th Cir. 1991). Second, at the conclusion of the hearing, the magistrate judge ordered post-hearing briefing to be filed after the transcript of the hearing was available. The transcript was filed on March 8, 2007, Smith filed his post-hearing brief on March 27, 2007, and the government filed its brief on April 16, 2007. Thus, the excludable time extended to April 16, 2007.

---

[6]The government argues that the district court's July 16, 2007 date for re-starting Smith's Speedy Trial Act clock was actually too generous to Smith, because it failed to account for the time in which the government could have, but did not, file a response to Smith's objections to the report. Because Smith has not shown that the district court erroneously excluded any days from the Speedy Trial Act calculation, we need not, and do not, reach the government's argument.

21

See Davenport, 935 F.2d at 1228-29.  Third, the magistrate judge's thirty days of excluded time to consider the motion extended to May 17, 2007, when the magistrate judge issued her report.  See id.  Smith requested more time to file his objections to the report, and the district court granted the request on May 23, 2007. Smith filed his objections on June 15, 2007, which extended the excludable time to June 15, 2007.  Finally, the district court's thirty-day period to consider the report and objections extended the excludable time to July 16, 2007.  See Mers, 701 F.2d at 1335-37.

Accordingly, with the October 12, 2006 to July 16, 2007 time properly excluded, the district court accurately calculated that only 63 non-excludable days had run from Smith's arraignment on September 13, 2006 to the commencement of his trial on September 12, 2007.[7]

Alternatively, Smith argues that the delay in bringing him to trial violated his Sixth Amendment right to a speedy trial.  In determining whether a defendant has been deprived of his constitutional right to a speedy trial, courts must consider:

---

[7]The district court's 63-day calculation was as follows: 18 days between Smith's arraignment on September 13, 2007 and his motion for a 10-day continuance to file his motion to suppress, which Smith filed and the magistrate judge granted on October 2, 2007; 0 days during the continuance period; 0 days between the filing of Smith's motion to suppress on October 12, 2006 and July 15, 2007, the thirtieth day after Smith filed his objections to the magistrate judge's report on the motion to suppress; 45 days between July 16, 2007 and August 29, 2007; and 0 days between August 30, 2007, on which Smith filed a motion in limine, and September 12, 2007, when the district court ruled on the motion in limine and started the trial.

"(1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of the right; and (4) the prejudice to the defendant." United States v. Dunn, 345 F.3d 1285, 1296 (11th Cir. 2003).

The first factor measures the delay between indictment and the start of trial. It must be satisfied with some "presumptively prejudicial period of delay" before a court need consider the other factors. Id. (quotation marks omitted). "A delay is considered presumptively prejudicial as it approaches one year." Id.

Smith satisfies the first and third factors. Smith was indicted on September 6, 2006, and his trial began on September 12, 2007. This one-year delay is presumptively prejudicial. Smith also adequately asserted his speedy trial right, thereby satisfying the third factor.

However, the "reasons for the delay" factor does not weigh in Smith's favor. Indeed, much of the delay was occasioned by litigation of Smith's motion to suppress. And, it was not unreasonable for the district court sua sponte to continue the trial for two weeks due to a change in the court's own schedule. Thus, Smith has not satisfied the second factor.

Because not all of the first three factors weigh against the government, Smith must show actual prejudice. See Dunn, 345 F.3d at 1296 (stating that "a defendant generally must show actual prejudice unless the first three factors all

23

weigh heavily against the government" (quotation marks, citation, brackets, and ellipsis omitted)). Smith has failed to show actual prejudice. His brief states only the conclusion that he suffered prejudice, without enumerating how or why. He has not shown that he endured oppressive pretrial incarceration, that he suffered particular delay-related anxiety and concern, or that his defense was impaired by the wait of slightly more than a year in bringing his case to trial. See id. Thus, Smith has not shown that his Sixth Amendment right to a speedy trial was violated.

## B.    Motion to Suppress

Smith contends the district court erred in denying his motion to suppress all evidence (in particular, the gun) and statements obtained by police following his arrest.[8] He maintains that Officer Henderson arrested or attempted to arrest him (as they were getting off the bus) without probable cause, and that therefore all evidence obtained as the fruit of that wrongful arrest must be suppressed. In support, he argues: (1) upon arrival, Officer Henderson knew only that some type of dispute or disturbance had occurred; (2) Officer Henderson spoke to Boothe only briefly, and made no other investigation, before approaching Smith on the bus; (3) Officer Henderson had no basis for determining the trustworthiness of

---

[8]When examining a district court's denial of a motion to suppress evidence, we review the court's findings of fact for clear error and its application of the law to the facts de novo. United States v. Steed, 548 F.3d 961, 966 (11th Cir. 2008). We construe the facts in the light most favorable to the prevailing party – in this case, the government. Id.

24

Boothe's assertion that Smith had grabbed her; (4) once on the bus, Officer Henderson immediately ordered Smith to leave the bus and took hold of Smith's arm to escort him off; and (5) after Smith and Officer Henderson left the bus, Henderson tried to place Smith in handcuffs.

The Fourth Amendment prohibits police officers from seizing a person unreasonably. United States v. Ramirez, 476 F.3d 1231, 1236 (11th Cir.), cert. denied, __ U.S. __, 127 S. Ct. 2924 (2007). An arrest qualifies as a seizure of the person. See United States v. Virden, 488 F.3d 1317, 1321 (11th Cir. 2007). In general, the reasonableness of an arrest or other seizure turns on the presence, or absence, of probable cause. Dunn, 345 F.3d at 1288. "Probable cause to arrest exists when the totality of the facts and circumstances support a reasonable belief that the suspect had committed or was committing a crime." United States v. Lindsey, 482 F.3d 1285, 1291 (11th Cir.), cert. denied, __ U.S. __, 128 S. Ct. 438 (2007) (quotation marks omitted).

An exception to the probable cause requirement exists for investigatory detentions whereby "minimally intrusive searches and seizures of the person are permissible when a law enforcement officer has an objectively reasonable suspicion that criminal activity may be afoot." United States v. Heard, 367 F.3d 1275, 1278 (11th Cir. 2004) (quotation marks omitted). Reasonable suspicion "can

arise from information that is less reliable than that required to show probable cause." Id. (quoting Alabama v. White, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416 (1990)). Nevertheless, it must derive from "something more than an inchoate and unparticularized suspicion or hunch." Dunn, 345 F.3d at 1289 (quotation marks omitted).

It is questionable whether Officer Henderson's actions in stopping the bus, ordering Smith to leave, and taking Smith by the arm rise to the level of arrest. However, we need not address that question because Boothe's identification of Smith as the man who had attacked her that day gave Officer Henderson not only reasonable suspicion, but also probable cause, to believe Smith had committed a crime. See United States v. Burbridge, 252 F.3d 775, 778 (5th Cir. 2001) ("An ordinary citizen's eyewitness account of criminal activity and identification of a perpetrator is normally sufficient to supply probable cause to stop the suspect."); Woods v. City of Chicago, 234 F.3d 979, 996 (7th Cir. 2001) ("[W]e have consistently held that an identification or a report from a single, credible victim or eyewitness can provide the basis for probable cause."); cf. Heard, 367 F.3d at 1278 (concluding that an anonymous face-to-face tip that a man with whom the tipster had been arguing had a gun provided reasonable suspicion for a stop and frisk).

Furthermore, the officers certainly had probable cause to arrest Smith afer he

26

tried to flee from Officer Henderson and then attacked him. Once Smith and Officer Henderson left the bus, Boothe testified that she "saw [Officer Henderson] attempt to arrest [Smith] and which [Smith] resisted and he tried to run. And [Officer Henderson] grabbed the back of his shirt first, and that's when [Smith] turned around and started attacking" Officer Henderson. Officer Henderson testified that he got off the bus with Smith and the "[n]ext thing that I can remember is I feel this burst of pain in my head . . . and then I'm covered in my blood." He was asked, "That's immediately after you get off the bus?" and responded, "That's the last thing I can recall after the bus, getting off the bus." Cole, the bus driver, testified that once the two men left the bus, "[t]hat's when it was commotion" and then he saw Smith and Officer Henderson on the ground fighting. Certainly, at this point Officer Henderson and the other officers had probable cause for an arrest. Cf. United States v. Gonzalez, 71 F.3d 819, 826-27 (11th Cir. 1996) (stating that police had probable cause to arrest a defendant who fled when they attempted to stop his vehicle); United States v. Bailey, 691 F.2d 1009, 1018 (11th Cir. 1982) (concluding that, even if a drug enforcement agent's initial arrest of the defendant was illegal, the defendant's subsequent flight and assault of the agent constituted probable cause to re-arrest the defendant). Because Smith was detained and arrested with probable cause, the district court properly

denied his motion to suppress.

## C.     Sufficiency of the Evidence

Smith argues that the district court erred in denying his motions for a judgment of acquittal based on sufficiency of the evidence.[9]  To convict Smith under § 922(g), the government had to prove beyond a reasonable doubt that: (1) Smith was a convicted felon; (2) Smith knowingly possessed a firearm; and (3) the firearm was in, or affected, interstate commerce.  United States v. Wright, 392 F.3d 1269, 1273 (11th Cir. 2004).  At trial Smith stipulated he was a convicted felon, and he does not challenge the knowledge element.  As to the possession element, however, Smith argues that the evidence did not permit a reasonable jury to conclude, beyond a reasonable doubt, that he possessed the gun found at the scene.

We disagree.  The evidence of possession, while not overwhelming, was sufficient for a reasonable jury to conclude that Smith possessed the gun.  First, Boothe testified that she saw Smith beat Officer Henderson with a gun.  Specifically, Boothe testified Smith was on top of Officer Henderson "beating him with a gun."  The gun was silver, "shaped like a gun basically" and "looked like a

_____

[9]We review de novo a district court's denial of a motion for judgment of acquittal for insufficient evidence.  United States v. Jackson, 544 F.3d 1176, 1185 n.14 (11th Cir. 2008).  "In doing so, we draw all reasonable inferences in favor of the government and determine whether a reasonable factfinder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt."  Id. (quotation marks and citation omitted).

gun." Smith hit Officer Henderson with the gun repeatedly, and Officer Henderson had blood all over his face and dripping down his shirt. Boothe also testified that Smith chased her earlier in the day with his hand on his hip like he had a gun.

Second, the officers found a gun at the scene of the fight. Officer Brooks parked by the bus stop, where Officer Henderson and Smith were, and he saw the gun. Further, Officers Somers and Leblanc testified that they were present when Brooks discovered the gun. According to Somers, the gun was found in "a straight line to where I found Officer Henderson."

Third, Officer Henderson had serious injuries and testified he was hit with a blunt object. Officer Leblanc testified, and investigator Eric Anderson agreed, that no weapons other than the gun and no "rocks or bricks or anything" were found in the grassy area where Smith and Officer Henderson fought. Also, no civilians entered the area between the time of the fight and the time the gun was found.

Given this evidence cumulatively, a reasonable jury could have found beyond a reasonable doubt that Smith possessed the gun found at the scene of the fight.[10]

---

[10]We recognize that Smith stresses that Kennedy and Cole denied seeing a gun. However, their testimony was not as strong as Smith argues. Although Cole did not see Smith with a gun, Cole stated that he did not know whether he even saw Smith's hand or not, and that he was not looking for anything in particular. And Kennedy's testimony – that Smith only swung at Officer Henderson one time, and his blow missed – is inconsistent with Officer Henderson's serious injuries.

As to the interstate commerce nexus requirement, § 922(g)(1) provides that it is unlawful for a convicted felon to "possess in or affecting commerce, any firearm."  18 U.S.C. § 922(g)(1).  Smith acknowledges that the evidence – the gun was manufactured in Massachusetts, sold in Missouri, and discovered in Georgia – was sufficient to establish that the firearm "traveled in interstate commerce." United States v. Clay, 355 F.3d 1281, 1286-87 (11th Cir. 2004) (quoting United States v. Reynolds, 215 F.3d 1210, 1215 (11th Cir. 2000)); United States v. Dupree, 258 F.3d 1258, 1260 (11th Cir. 2001).

We reject Smith's argument that we should reconsider our precedent as inconsistent with the Supreme Court's decisions in United States v. Lopez, 514 U.S. 549, 115 S. Ct. 1624 (1995), and United States v. Morrison, 529 U.S. 598, 120 S. Ct. 1740 (2000), because we have already reaffirmed our "minimal nexus" requirement after the Lopez and Morrison cases.  See Dupree, 158 F.3d at 1259-60; see also United States v. Ballinger, 395 F.3d 1218, 1242 (11th Cir. 2005) (en banc) (discussing post-Morrison cases applying minimal interstate commerce nexus requirement for § 922(g) convictions).  Accordingly, Smith's challenge to the sufficiency of the evidence regarding the interstate commerce nexus fails.

## D.  Exclusion of Marino Simon

Smith contends the district court erred in excluding the testimony of Smith's

proposed witness Marino Simon based on Simon's violation of the rule of sequestration.[11] The district court has broad power to sequester witnesses during trial. United States v. Diaz, 248 F.3d 1065, 1104 (11th Cir. 2001). Further,

> [w]hen a violation of the sequestration rule occurs, the court may respond in one of three ways: (1) it may cite the guilty party for contempt; (2) it may allow opposing counsel to cross-examine the witnesses as to the nature of the violation; or (3) where counsel or the witness violate the rule intentionally, the court may strike testimony already given or disallow further testimony.

Id.

Upon commencement of the trial, the government invoked the rule of sequestration. Kennedy and Simon were directed not to speak with each other about their testimony.[12] When informed of a sequestration-rule violation, the district court separately questioned Simon, Kennedy, and Agent Michalik, who overheard them speaking.

Simon admitted he talked with Kennedy but said he did not ask about

---

[11]We review a district court's decision to exclude a witness for a sequestration rule violation for abuse of discretion. See United States v. Blasco, 702 F.2d 1315, 1327 (11th Cir. 1983) (applying abuse of discretion standard); United States v. Monaco, 702 F.2d 860, 871 (11th Cir. 1983) (stating that although the testimony of a witness who violates the rule of sequestration is not necessarily inadmissible, "whether such a witness is to be permitted to testify is generally left to the sound discretion of the trial court"). "In order to justify reversal for violation of the sequestration rule, the defendant must show sufficient prejudice." United States v. Womack, 654 F.2d 1034, 1040 (5th Cir. Unit B Aug. 31, 1981); see also Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982) (stating that Unit B decisions of the former Fifth Circuit are binding precedent in this Court).

[12]Smith does not dispute that Simon was told not to speak to other witnesses about their testimony.

Kennedy's testimony. Kennedy testified that Simon "was asking me" about what had been discussed in the courtroom, but that "I didn't really tell him." However, Kennedy also admitted: "I was just, like, I said we seen the fight," but "[w]e didn't really say anything about it." Agent Michalik testified that she saw Kennedy talking to Simon in the hallway outside the courtroom; she stated, "I heard [Kennedy] say, 'I just told them that me and my cousin was sitting on the porch.'" According to Agent Michalik, Kennedy and Simon continued to talk more quietly, and she could not make out the rest of their conversation.

After hearing this testimony, the district court found Agent Michalik's testimony to be more credible than Kennedy's and Simon's, found that Simon had violated the sequestration rule, and on that basis excluded Simon's testimony. While the district court did not use the word "intentional," the context of the court's ruling and the exclusion of the testimony suggest the district court considered the violation intentional. Given the district court's findings, we conclude Smith has not shown the district court abused its discretion in excluding Simon's testimony.

Alternatively, Smith has not shown prejudice to justify reversal. When the district court barred Simon from testifying, Kennedy already had testified. Simon watched the fight between Smith and Officer Henderson from the same vantage

32

point as Kennedy. The proffer of Simon's testimony reveals nothing that was different from Kennedy's. Although Simon would have testified that he saw nothing in Smith's hands, Kennedy already had testified similarly. Thus, because Simon's testimony would have been cumulative, Smith cannot show prejudice. See, e.g., United States v. Smith, 441 F.3d 254, 263 (4th Cir. 2006) (concluding that exclusion of a witness's testimony for violating sequestration rule was harmless error because the witness's testimony "would have been cumulative"); United States v. Atkins, 487 F.2d 257, 259 (8th Cir. 1973) (noting that even if a sequestration-order violation did not justify exclusion, no prejudicial error existed because the rejected testimony was "merely cumulative" of other testimony already introduced).

## E.     Medical Records Hearsay Exclusion

Smith's fifth issue on appeal involves testimony by a nurse who treated Officer Henderson for the wounds received in the fight with Smith.[13] The district court ruled that the nurse could not testify as to notes in the hospital's treatment records that allegedly indicated that (1) Officer Henderson was hit with a rock, (2) Officer Henderson was hit with a brick, and (3) Officer Henderson told a doctor that he thought he was hit with a silver CD player or a silver gun found at the

---

[13]We review a district court's hearsay rulings for abuse of discretion. United States v. Brown, 441 F.3d 1330, 1359 (11th Cir. 2006).

scene. The district court determined that these alleged statements by Henderson were made to doctors or emergency medical technicians, and not to the nurse herself, and thus were inadmissible hearsay.

This proffered testimony presents a question of triple hearsay: statements by Officer Henderson to doctors/emergency medical technicians, to the nurse, who recorded them in hospital records. According to Federal Rule of Evidence 805, "[h]earsay included within hearsay" is inadmissible unless "each part of the combined statements conforms with an exception to the hearsay rule." Fed. R. Evid. 805. Smith contends that the hearsay testimony was admissible through the combined operation of the medical treatment and business records hearsay exceptions found, respectively, in Federal Rule of Evidence 803(4)[14] and (6).[15]

If Officer Henderson made statements to his doctors or the EMTs for

---

[14]Rule 803(4) provides that the hearsay rule does not exclude:
[s]tatements made for purposes of medical diagnosis or treatment and describing . . . past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.
Fed. R. Evid. 803(4).

[15]Rule 803(6) similarly excepts from the hearsay rule:
A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.
Fed. R. Evid. 803(6) (emphasis added).

treatment purposes, such statements would fall within the medical treatment

hearsay exception in Rule 803(4). And, if the doctors or EMTs told the nurse what

Officer Henderson said and the nurse entered that hearsay-excepted statement in

the hospital treatment records, the records would come within the business records

exception in Rule 803(6).[16]

However, the record reveals that the nurse was not sure who told her the

information she recorded in the treatment records.[17] Because the nurse does not

know for sure who told her the information, Smith could not show that the

information contained in the hospital treatment records was "transmitted by . . . a

person with knowledge." Fed. R. Evid. 803(6). This lack of knowledge, or at least

uncertainty, about who transmitted the information contained in the treatment

records also deprives the information of trustworthiness. See id. (stating the

business records exception does not apply if "the source of information or the

---

[16]Cf. Petrocelli v. Gallison, 679 F.2d 286, 289 (1st Cir. 1982) ("To be admissible as 'business records' under Rule 803(6), the referenced notations [in medical records] would have to represent either opinions or diagnoses of the Massachusetts General Hospital doctors who made the notations or the diagnoses of some other 'person with knowledge' (such as a medical colleague) who reported to the maker of the record as part of the usual business or professional routine of Massachusetts General Hospital.").

[17]According to the proffer of testimony, the nurse would testify only that "her emergency trauma notes most likely reflected conversations that she would have had with E.M.T.'s who transported Officer Henderson to the hospital" and that the doctor's progress notes "would likely reflect the conversation that Officer Henderson was having with the doctor himself at that point." Moreover, at trial the government indicated that, in interviews with government attorneys, the doctor who made the progress notes "does not know where that information [regarding the source of Officer Henderson's head injury] came from in the doctor's notes either."

35

method or circumstances of preparation indicate lack of trustworthiness");

Ricciardi v. Children's Hosp. Med. Ctr., 811 F.2d 18, 23 (1st Cir. 1987) (concluding notation in patient's medical records made by doctor who lacked personal knowledge of the alleged event he noted and who did not recall where he obtained the information he recorded in the notation did not qualify under the business records exception because "[a]n unknown source is hardly trustworthy").

The "touchstone of admissibility under Rule 803(6) is reliability, and a trial judge has broad discretion to determine the admissibility of such evidence." United States v. Arias-Izquierdo, 449 F.3d 1168, 1183 (11th Cir. 2006). We cannot say that the district court abused its broad discretion when it determined that the notations in the medical records that Smith sought to admit did not qualify under an exception to the hearsay rule.[18]

## F. Sentence Adjustment

Smith's final argument is that the district court erred in failing to adjust his federal sentence, pursuant to U.S.S.G. § 5G1.3(b)(1), for the time he already had spent incarcerated in connection with his underlying offense conduct.[19] This

---

[18]It is noteworthy that the medical records variously indicate that the source of Officer Henderson's head injury was a rock, a brick, a C.D. player, and the gun found at the scene. Thus, Smith has difficulty demonstrating the prejudice required to obtain a retrial.

[19]"We review the district court's application of the sentencing guidelines de novo." United States v. Descally, 254 F.3d 1328, 1330 (11th Cir. 2001).

includes both time spent in state custody on the charges arising from his August 5, 2006 arrest, and the time he spent in federal custody on writs of habeas corpus ad prosequendum to answer, and be sentenced for, the § 922(g) charge.

Section 5G1.3(b)(1) provides that a court shall adjust a federal sentence for prison time already served if: (1) "a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct)"; (2) the other offense "was the basis for an increase in the offense level for the instant offense under Chapter Two (Offense Conduct) or Chapter Three (Adjustments)"; and (3) "the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons." U.S.S.G. § 5G1.3(b)(1) (2007).

The parties agree that (1) Smith's state aggravated assault conviction represents relevant conduct, (2) it was the basis for an increase in his offense level for his federal conviction, and (3) the Bureau of Prisons is not authorized to credit the time Smith served on his state aggravated assault conviction to Smith's federal sentence because this time was credited toward his state sentence. See 18 U.S.C. § 3585(b) (stating that a defendant shall not be credited time spent detained before sentence commences if that time has "been credited against another sentence").

Accordingly, the government concedes that the district court erred in failing

37

to credit Smith, under U.S.S.G. § 5G1.3(b)(1), for his presentence period of incarceration. See Descally, 254 F.3d at 1333 (vacating sentence for failing to credit defendant under U.S.S.G. § 5G1.3(b)(1) for time served before federal sentencing in state custody for related crime). We therefore vacate Smith's sentence and remand to the district court for the limited purpose of re-sentencing Smith to give him credit for the time he spent in custody between the time of his arrest and his federal sentencing.

### III. CONCLUSION

For the reasons set forth above, we affirm Smith's conviction but vacate his sentence and remand this case to the district court for re-sentencing consistent with this opinion.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART.**