[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 1, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-12765

_____

D.C. Docket No. 04-00222-CR-WS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

OMAR RAMIREZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(February 1, 2007)**

Before BIRCH and CARNES, Circuit Judges, and TRAGER,[*] District Judge.

BIRCH, Circuit Judge:

---

[*] Honorable David G. Trager, Senior U.S. District Judge for the Eastern District of New York, sitting by designation.

Appellant Omar Ramirez challenges the district court's denial of his motion to suppress evidence in his case. On appeal, Ramirez argues that he was unlawfully detained by the police in violation of the Fourth Amendment, and that therefore the evidence discovered as a result of that detention should have been suppressed. Because we find that Ramirez's Terry[1] stop had become a consensual encounter at the time he agreed to a search of his vehicle, we conclude that suppression of the evidence was unwarranted. Accordingly, we AFFIRM the district court's denial of his motion.

## I . BACKGROUND

On 11 September 2004, at approximately 9 p.m., Alabama State Trooper Corporal Charlton Martin was assisting a trooper in the arrest of two individuals on the eastbound side of Interstate 10. Corporal Martin's police vehicle was parked in the emergency lane on the side of the highway. At that time, Corporal Martin observed a blue Crown Victoria as it crossed the solid white on the side of the highway and veered into the emergency lane, nearly hitting Corporal Martin's car. The car then returned to the highway, and continued traveling along Interstate 10. Corporal Martin asked Sergeant Kerry Mitchum, of the Loxley, Alabama, Police

---

[1] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968).

Department, who was present with him, to pull over the Crown Victoria while

Corporal Martin completed his arrest. Sergeant Mitchum proceeded to pull over

the Crown Victoria, which was being driven by Ramirez. Approximately two

minutes later,[2] Corporal Martin arrived at the location where Ramirez's car had

been stopped alongside Interstate 10. At that time, Corporal Martin took over the

stop from Sergeant Mitchum.

By the time Corporal Martin arrived at the scene, Ramirez had been asked

by Sergeant Mitchum to step out of his vehicle, due to some confusion as to who

was the owner of the car.[3] When Corporal Martin approached Ramirez and

Sergeant Mitchum, he was handed Ramirez's paperwork (including his driver's

license and vehicle registration) and was informed by Sergeant Mitchum that there

was "a problem with [Ramirez]'s paperwork." R2 at 8. When Corporal Martin

asked Ramirez from whom he had purchased the vehicle, Ramirez appeared

confused, and attempted to read the name off of the registration that Corporal

---

[2] Ramirez's traffic stop and his subsequent arrest were recorded on the police video that was located in Sergeant Mitchum's patrol car. The video camera's time stamp reflects that Ramirez was stopped at approximately 21:07, and that Corporal Martin arrived at the scene at approximately 21:09.

[3] The police videotape reflects that when Ramirez was initially asked by Sergeant Mitchum who the car belonged to, Ramirez mentioned someone named "Perez." See R, Exh. 1 at 21:09. Ramirez then was asked whether he had paperwork evincing the purchase from Mr. Perez, such as a bill of sale, but he was unable to provide a satisfactory answer to that question. Because of this apparent confusion over who owned the vehicle, Sergeant Mitchum asked Ramirez to exit the vehicle so that he could question him further.

3

Martin was holding in his hand.  Ramirez was unable to tell Corporal Martin from whom he had purchased the car.  At that time, Corporal Martin began to suspect that the vehicle might be stolen.

Corporal Martin later testified that Ramirez appeared nervous, even more so than the nervous behavior that Corporal Martin had typically observed during routine traffic stops.  He testified that "[the] carotid artery in his neck was bulging" and that "[y]ou could see his heart pounding through his t-shirt." R2 at 9.  The videotape of the stop reflects that, during the initial encounter with the police, Ramirez was fidgeting and pacing in front his vehicle; at one point he attempted to walk away and was instructed to remain close to the trunk of his car.

Corporal Martin asked Ramirez about his travel plans.  Ramirez indicated that he was traveling from Brownsville, Texas, where he resided, to south Florida, near Miami, to pick up $1,500 in cash from a family member.  When he was asked why his family hadn't simply wired the money to him– so as to avoid a drive from Texas to Florida–Ramirez appeared confused by the question.  Corporal Martin and Sergeant Mitchum returned to their respective vehicles.  Meanwhile, a third officer, Trooper Charles Anderson, arrived at the scene to assist with the stop.  Throughout this time, Ramirez remained standing at the rear of his vehicle.

Sergeant Mitchum ran a check of Ramirez's driver's license, which was

4

reported as being "status clear." See R, Exh. 1 at 21:13. Sergeant Mitchum was also informed that the vehicle was registered in the name of a Raul Perez, which was consistent with the answer Ramirez had given Sergeant Mitchum at the time of the initial stop. See id. at 21:09. In addition to the driver's license check, Sergeant Mitchum requested a background check on Ramirez from the Blue Light Operations Center ("BLOC"). Corporal Martin later testified that he had decided to run a BLOC check on Ramirez because he was from Brownsville, Texas, a border town that is a source of heavy narcotic activity, and he was traveling to south Florida, another source area for narcotic activity. While the officers were awaiting the results of the BLOC check, Corporal Martin began to prepare a warning citation for Ramirez for crossing over the line into the emergency lane on a highway.

As the traffic citation was being prepared, Sergeant Mitchum and Corporal Martin engaged in additional questioning of Ramirez. They asked Ramirez if he had stopped to eat during his travels, and where he had stopped. Ramirez was also asked by Corporal Martin why he had been weaving on the highway; he answered that he had been talking on his cell phone with his mother. Sergeant Mitchum interjected that Ramirez had told him earlier that he had been weaving because he was tired and had been driving all day. Although Ramirez was arguably

5

inconsistent in explaining why he had been weaving, however, as Corporal Martin later confirmed, there was no evidence to suggest that Ramirez was under the influence of any drugs or alcohol. The officers also asked Ramirez at one point how much money he was carrying on him, and whether he was planning on using that cash for food and gas stops along the highway.

Corporal Martin then issued a warning citation to Ramirez for failing to remain in the lane on an interstate. Corporal Martin gave the citation to Ramirez for his signature, along with his driver's license and registration.[4] Almost immediately after returning all of Ramirez's paperwork to him– and advising Ramirez that "the traffic stop [was] over," R2 at 16– the officers received a call from BLOC, notifying them that Ramirez's criminal background was clean, other than a minor marijuana offense when Ramirez was a juvenile.[5]

---

[4] Although Corporal Martin and Ramirez are not in view of the camera located in the police vehicle, audio portions of their dialogue are discernible. Corporal Martin can be heard saying "here's your paperwork," advising Ramirez that the citation is a warning, and asking him to sign the citation. R, Exh. 1, at 21:21:23-32. Approximately ten seconds later, Corporal Martin can be overhead asking "you got your license?". R, Exh. 1, at 21:21:44. Ramirez responds, "yeah, I got my license." R, Exh. 1 at 21:21:45-49. The officer then asks, "you got your registration?" and receives an inaudible response. R, Exh. 1 at 21:21:49-51.

[5] Although Corporal Martin testified that he stated to Ramirez that "the traffic stop [was] over," R2 at 16, that portion of the audio is not discernible from the videotape recording. This is perhaps due to the fact that the audio recording of the conversation between Corporal Martin and Ramirez– alongside the highway– is drowned out by the phone call from BLOC, which was received inside Sergeant Mitchum's vehicle. See R2 at 44; R, Exh. 1 at 21:21:51. Although Corporal Martin's statement is not perceptible from the video, it is his unrebutted testimony that he stated "the traffic stop is over," R2 at 16, and the district court accepted this testimony as fully credible in rendering its decision. R2 at 73.

6

At this time, Ramirez had apparently been given back his paperwork,[6] and, according to Corporal Martin's testimony, the traffic stop had ended. Corporal Martin testified that, "after [he] issued the citation and gave him back all his personal belongings," he asked Ramirez "if he was carrying anything illegal in the car." R2 at 17. Ramirez responded by advising Corporal Martin that he could search the vehicle if he wanted to.[7] After some additional discussion, a consent to search form was provided to Ramirez. Corporal Martin explained the substance of the form to him, Ramirez promptly signed it,[8] and Corporal Martin began a search of Ramirez's vehicle. After searching the vehicle for approximately 20 minutes, Corporal Martin uncovered approximately seven kilograms of cocaine, which had been hidden inside of the dashboard of the vehicle.

After he was indicted, Ramirez filed a motion to suppress the evidence that had been discovered in connection with the search of his car. He argued that he

---

[6] At a minimum, the videotape reflects that Ramirez had been given the citation and his license and registration; Ramirez held them in his hand while conversing with Corporal Martin, prior to the search of the vehicle. See R, Exh. 1 at 21:21:51- 21:22:17.

[7] As with Corporal Martin's statement "the traffic stop is over," R2 at 16, none of the audio from this pivotal exchange between Corporal Martin and Ramirez is discernible from a review of the videotape. However, approximately 30 seconds into their discussion, Corporal Martin can be overheard advising Sergeant Mitchum: "he offered for us to search his car." R, Exh. 1 at 21:22:18.

[8] The lapse between the time Ramirez was given his license and registration and when he signed the consent form, agreeing a search of his car, was approximately one minute. See R, Exh. 1 at 21:21:51-21:22:55.

was unlawfully detained in violation of the Fourth Amendment, in that his continued detention by the police was undertaken without any reasonable suspicion of any further criminal activity.[9]  Because his prolonged detention was unconstitutional, Ramirez argued that everything which followed from that alleged detention–the consent to search, the search of the vehicle, and all items seized from the vehicle– should have been excluded.

The district court conducted a hearing on Ramirez's motion, at which Corporal Martin testified.  After reviewing Corporal Martin's testimony and the evidentiary record, the district court denied Ramirez's motion.  The district court found that Corporal Martin's testimony was credible, and that it had not been rebutted by Ramirez.  The court first found that the facts presented– the initial traffic violation, Ramirez's nervous behavior upon further questioning, and his suspicious answers concerning the ownership of the vehicle–were sufficient to create a reasonable suspicion so as to justify the initial detention of Ramirez and the license check.  The court concluded that the officer's check of the driver's license, and the preparation of the traffic citation, were undertaken within a reasonable time and were entirely lawful.  Turning to the question of whether the

---

[9] Ramirez also intimated in his motion to suppress that the consent to search his vehicle was not voluntarily obtained, and that therefore it was invalid.  See R1-15 at 3-4.  However, Ramirez has abandoned that argument on appeal, focusing only on the lawfulness of the underlying detention.

prolonging of the traffic stop– after Ramirez's license came back clear– was

unlawful, the court found:

> The driver's license registration was returned to Mr. Ramirez, and he was issued a warning ticket. And almost simultaneous with the issue of the warrant [sic.], or as it was being handed . . . he was asked if there was contraband in the car and gave initially verbal consent which almost immediately transitioned into the written consent.

R2 at 74-75. In light of these findings of fact, the court concluded that "there [was]

no unlawful detention within the meaning of those terms and principles as

governed by the law in this Circuit." Id. at 75. Because there was no unlawful

detention at the moment when Ramirez consented to have his car searched– a

consent which the court accepted as voluntary–the court concluded that Ramirez's

Fourth Amendment rights were not violated, and, consequently, there was no basis

to suppress the evidence that had been discovered by the police.

After his motion to suppress was denied, Ramirez pled guilty to one count of

possession with intent to distribute cocaine, 21 U.S.C. § 841, but preserved his

right to appeal the denial of his motion. Ramirez was sentenced to a term of

imprisonment of 46 months. This appeal followed.

## II.  DISCUSSION

In reviewing a district court's denial of a motion to suppress, we review its

findings of fact for clear error and its application of law to those facts de novo.

United States v. Acosta, 363 F.3d 1141, 1144 (11th Cir. 2004).  Further, when considering a ruling on a motion to suppress, all facts are construed in the light most favorable to the party prevailing in the district court– in this case, the government.  United States v. Hromada, 49 F.3d 685, 688 (11th Cir. 1995).

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures.  U.S. CONST. amend. IV.  A seizure takes place "whenever a police officer accosts an individual and restrains his freedom to walk away."  United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003) (citation omitted).  Traffic stops qualify as seizures under the Fourth Amendment.  Delaware v. Prouse, 440 U.S. 648, 653, 99 S. Ct. 1391, 1396 (1979); Perkins, 348 F.3d at 969.  "Because a routine traffic stop is only a limited form of seizure," however, "it is more analogous to an investigative detention than a custodial arrest."  United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001).  Therefore, we analyze the legality of these stops under the standard articulated in Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968).  Id. (citations omitted).  According to that standard, "an officer's investigation of a traffic stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'"  United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (citing Terry, 392 U.S. at 20, 88 S. Ct. at 1879).  Furthermore, the duration of the

10

traffic stop "must be limited to the time necessary to effectuate the purpose of the stop." Purcell, 236 F.3d at 1277. Despite hinting at these arguments in his initial motion to suppress, on appeal Ramirez does not challenge either the legality or the duration of the *initial* stop. That is, Ramirez does not dispute that the police had a reasonable suspicion to support both the initial traffic stop and the license check that ensued.

Instead, Ramirez's argument is that once Corporal Martin had confirmed that Ramirez's vehicle was not stolen, and once he had been advised that Ramirez's driving record was clean, Corporal Martin had no basis to continue to detain him against his will.[10] According to this argument, once Corporal Martin had issued a formal traffic citation, and once Corporal Martin's suspicions of illegality had been completely dispelled, Ramirez was free to go. Nevertheless, Corporal Martin asked him an additional question–whether he had anything illegal in his vehicle–which, Ramirez contends, extended his detention unnecessarily in violation of Terry. See, e.g., United States v. Pruitt, 174 F.3d 1215, 1221 (11th Cir. 1999) (stating that, after a traffic citation had been processed, the defendants

_____

[10] As was discussed previously, Ramirez's argument centers only on the unlawfulness of his detention–after the police had completed their check of his license, registration, and criminal background–rather than on the validity of his consent. If Ramirez can successfully show that his consent was obtained "as the result of an illegal detention," then the consent to search was invalid and the evidence discovered as a result of the search should have been suppressed. See United States v. Simms, 385 F.3d 1347, 1353 (11th Cir. 2004).

11

"should have been free to go, as [the officer] was provided at that time with no reasonable suspicion of their criminal activity," and suggesting that, under those circumstances, additional questioning which unlawfully extended their detention violated Terry). Ramirez argues that, because his consent, the search of his vehicle, and the discovery of the cocaine were products of an unconstitutional detention, they should have been suppressed. See United States v. Chanthasouxat, 342 F.3d 1271, 1280 (11th Cir. 2003) ("As a general rule, the evidence gathered as a result of an unconstitutional stop must be suppressed.") (citing Wong Sun v. United States, 371 U.S. 471, 484-85, 83 S. Ct. 407, 416 (1963)).

We have held that a traffic stop "must last no longer than is necessary to effectuate the purpose of the stop." Pruitt, 174 F.3d at 1220 (citation omitted).[11] In Pruitt, we made clear that a police officer's "[l]engthening the detention for further questioning beyond that related to the initial stop is permissible in two circumstances." Id. "First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable

---

[11] We have also stated that, in reviewing a detention, "it is unreasonable extensions of the duration– not the scope of the [questioning]– that could render an otherwise justified detention unreasonable for Fourth Amendment purposes." United States v. Hernandez, 418 F.3d 1206, 1209 n.3 (11th Cir. 2005). That is, we do not inquire as to the substantive reasonableness of the questions that are asked by a police officer in the context of a traffic stop, but only whether the "duration" of the detention was prolonged "for an unreasonable time." Id. Here, because we conclude that Ramirez was not "detained" at all for purposes of the Fourth Amendment at the time Corporal Martin asked further questions of him, we need not address whether the alleged extension of the duration of the traffic stop was reasonable or unreasonable under Hernandez.

12

suspicion that illegal activity has occurred or is occurring." Id.; see also Boyce,

351 F.3d at 1106. "Second, further questioning unrelated to the initial stop is

permissible if the initial detention has become a consensual encounter." Pruitt, 174

F.3d at 1220. For purposes of the second situation, a consensual encounter does

not implicate Fourth Amendment scrutiny. Florida v. Bostick, 501 U.S. 429, 434,

111 S. Ct. 2382, 2386 (1991). In this case, we conclude that Ramirez's stop had

become a consensual encounter at the time Corporal Martin asked Ramirez

whether he had anything illegal in his car.[12] Accordingly, we conclude that

Ramirez was not "detained" for purposes of the Fourth Amendment, and that

_____

[12] Both of the parties have argued, in their briefs and at oral argument, as to whether the police had "a particularized and objective basis for suspecting legal wrongdoing" so as to support the prolonging of Ramirez's detention. Perkins, 348 F.3d at 970 (citation and internal quotations omitted). The government argues that the "totality of the circumstances," id., clearly gave rise to an objectively reasonable suspicion that Ramirez had engaged in some illegal activity at the time Corporal Martin continued to question him. Specifically, the government contends that, taken together, the facts of Ramirez's case– his nervous behavior, his vague answers as to who owned the car, his itinerary (which involved travel from a Texas border town to south Florida), and his story concerning the purpose of his trip (to pick up $1500 from a family member)– were sufficient to give rise to a reasonable suspicion on the part of Corporal Martin that some criminal activity was afoot. In light of that argument, the government asserts that the purported prolonging of his detention (by questioning Ramirez) was lawful. See, e.g., Simms, 385 F.3d at 1354-55 (a prior history with drugs, nervous conduct, and a questionable story about the defendant's travel plans were sufficient to create a reasonable suspicion so as to justify prolonging the detention).

Ramirez, on the other hand, contends that his nervousness, his itinerary, and his odd behavior were *not* sufficient to create a reasonable suspicion to support prolonging his detention, and that therefore this case is akin to the extended detention based on a "hunch" which we deemed unconstitutional in Perkins, 348 F.3d at 971. As is discussed subsequently, however, because we find that the traffic stop became a consensual exchange upon issuance of the traffic citation, we need not pass on the sufficiency of the evidence to support a reasonable suspicion– the first situation discussed in Pruitt. See 174 F.3d at 1220.

13

therefore there is no basis for suppression.

Although we have not directly addressed the question of when a Terry traffic stop shifts from a "detention" to a "consensual encounter," Pruitt, 174 F.3d at 1220, we are not without guidance on this question. The Supreme Court, in other contexts, has held that a person being questioned by police is not seized "if a reasonable person would feel free to terminate the encounter." United States v. Drayton, 536 U.S. 194, 201, 122 S. Ct. 2105, 2110 (2002). That is, where a reasonable person "would feel free to decline the officers' requests or otherwise terminate the encounter," Bostick, 501 U.S. at 436, 111 S. Ct. at 2387, the encounter with the police is consensual, and the Fourth Amendment is not implicated. This test "is objective and presupposes an *innocent* person." Drayton, 536 U.S. at 201, 122 S. Ct. at 2110 (citation and internal quotation omitted).

Our sister circuits have been more specific in addressing the issue of when a Terry traffic stop segues into a consensual encounter. In United States v. Lattimore, a case similar to Ramirez's, the Fourth Circuit rejected a defendant's assertion that additional questioning by the police constituted an illegal prolonging of his detention. 87 F.3d 647, 650, 652-53 (4th Cir. 1996) (en banc). In that case, after the police officer returned the defendant's license and handed him a traffic citation, the officer questioned the defendant as to whether there were any

14

narcotics or contraband in the automobile.  Id. at 649.  The Fourth Circuit rejected the defendant's claim that this questioning constituted an unlawfully prolonged detention.  Id. at 653.  The court observed that the defendant's documents had been returned to him, which suggested that

> all business with [the defendant] was completed and that he was free to leave.   During the subsequent conversation between [the officer] and [the defendant], a reasonable person would have felt free to decline the officer's requests or otherwise terminate the encounter.  The totality of the circumstances presented indicate that from this point forward the encounter was consensual . . . .

Id. (citation, alterations, and internal quotations omitted).

Likewise, in United States v. White, the Eighth Circuit reviewed a case in which a police officer "handed [the defendant] his license and registration, and explained the warning ticket" to the defendant. 81 F.3d 775, 777 (8th Cir. 1996). The officer then asked the defendant for permission to search his vehicle.  Id. at 778.  The court rejected the defendant's claims that the traffic stop had escalated into an unlawful detention in violation of the Fourth Amendment.  Rather, the court stated:

> [A]fter [the defendant]'s license and registration were returned and the warning was issued, the encounter became nothing more than a consensual encounter between a private citizen and a law enforcement officer.

Id. at 778.   The court based this determination on a number of factors, including

15

the fact that the officer did not behave in a threatening or coercive manner during the post-citation conversation, the fact that the tone of the exchange was cooperative, and the fact that "at the time [the officer] asked to search the vehicle, [the defendant] had everything he needed to lawfully proceed on his journey." Id. at 779.

Similarly, in United States v. Sanchez-Pena, the Fifth Circuit held that, where a defendant had received all of his documentation back and was subsequently questioned, the encounter was consensual and the Fourth Amendment was not implicated. 336 F.3d 431, 443 (5th Cir. 2003). The court based this conclusion on the fact that, in conversing further with the defendant, the officer did not accuse the defendant of any illegality or wrongdoing. Id. The court also observed that the defendants had been given back their documentation, suggesting that they were free to go on their way at the time additional questions were asked of them. Id. As an aside, the court noted that its conclusion that such an encounter was consensual was in line with the decisions of the vast majority of circuits that have ruled on this issue. Id. n.60.

In this case, the district court's opinion implicitly found that Corporal Martin had returned Ramirez's license and registration to him *prior to* instigating any additional questioning about contraband in the car. See R2 at 74 (stating, at the

16

outset, that "[t]he driver's license registration was returned to Mr. Ramirez, and he was issued a warning ticket"). Although the court went on to state that Corporal Martin's handing of the Ramirez's paperwork back to him was "almost simultaneous" with his follow-up question, R2 at 74-75, the court's opinion nevertheless suggested that, while "almost simultaneous," R2 at 74-75, the issuance of the citation and the return of Ramirez's paperwork preceded the questioning concerning contraband in the vehicle.[13] Accordingly, the court concluded that Ramirez was not detained for purposes of the Fourth Amendment.

These conclusions were proper. Corporal Martin's testimony, which was credited by the district court as fully credible, made clear that he "had returned everything to [Ramirez] and told him the traffic stop [was] over" prior to asking about contraband in the vehicle. R2 at 16. Furthermore, in response to the question "what happened after you issued [Ramirez's] citation and gave him back all his personal belongings?," Corporal Martin testified that he then asked Ramirez

_____

[13] The phrase "almost simultaneous" is rather ambiguous and is open to interpretation. On the one hand, the use of the qualifying word "almost" suggests that the two events were not simultaneous, *i.e.* that one clearly did precede the other. On the other hand, the word "almost" could be construed as suggesting that the two events happened at more or less the same time. To the extent that the district court found that the two events were simultaneous in nature, that finding was clearly erroneous. Indeed, as is discussed subsequently, our review of the record suggests that the two events were not simultaneous, and that the handing over of Ramirez's paperwork clearly preceded the follow-up question concerning contraband in the car. However, because we construe the district court's opinion as finding that the handing of the paperwork preceded the subsequent question, we discern no error in the court's findings of fact.

17

"if he was carrying anything illegal in the car." R2 at 17.

The videotape corroborates this version of events; at a minimum, the video suggests that Ramirez had received his citation, and had been handed his license and registration, prior to being asked any questions about whether there was contraband in the car. Although the parties are out of view on the video recording, Corporal Martin can first be overheard saying "here's your paperwork," advising Ramirez that the citation is only a warning, and asking him to sign the citation. R, Exh. 1, at 21:21:28-32. Approximately ten seconds later, Corporal Martin can be overheard asking "you got your license?", to which Ramirez responds, "yeah, I got my license." R, Exh. 1, at 21:21:44-49. Corporal Martin then asks, "you got your registration?", and receives an inaudible response. R, Exh. 1, at 21:21:49-51. Within seconds of that exchange–"almost simultaneous" with it, R2 at 74-75, but clearly after it–Ramirez can be seen holding his documents in his hand while he converses further with Corporal Martin, presumably about the prospect of searching his vehicle. See R, Exh. 1 at 21:51:21- 21:22:30. While holding the documents in his hand, Ramirez gestures toward the vehicle and asks an inaudible question, apparently about the nature of the search. R, Exh. 1 at 21:22:20-21:22:30. All of these occurrences take place prior to Ramirez's signing of the consent to search form, which he signs on the hood of Sergeant Mitchum's vehicle.

We find that the videotape, taken together with Corporal Martin's unrebutted testimony, makes clear that the question to Ramirez occurred *after* Ramirez had been handed his paperwork and had received the traffic citation. That evidence suggests that, at the time of Corporal Martin's follow-up question, "all business with [Ramirez] was completed and that he was free to leave." Lattimore, 87 F.3d at 653, and that at that time the traffic stop had converted into a consensual encounter. Cf. Purcell, 236 F.3d at 1280 (suggesting that where the citation and paperwork had not been given back to the driver, the defendant was still detained). Accordingly, we discern no Fourth Amendment violation in Corporal Martin's post-citation question.

This is not to suggest that our decision is based solely on the fact that the traffic ticket and driver's license had been returned to Ramirez at the time Corporal Martin asked his follow-up question. Our conclusion in this case is based upon more than timing. Nor should our decision be construed as creating a per se rule that once a person's documentation has been returned to him in a traffic stop, it has automatically converted into a consensual encounter.[14] There is no bright-line

---

[14] In fact, our case law in this area has suggested that a person may nevertheless be unlawfully detained by the police, *despite the fact* that the citation has been completed and all of the person's paperwork has been given back to them. See, e.g., Perkins, 348 F.3d at 968-972 (concluding that person was held unlawfully, despite the fact that the ticket had been issued and the traffic stop was over, where the police asked defendant to await the arrival of a drug dog).

19

"litmus test" for whether a traffic stop is a seizure or is a consensual encounter. White, 81 F.3d at 779. As with our sister circuits, we find that it is appropriate to examine the "totality of the circumstances" in each case, Lattimore, 87 F.3d at 653, weighing a range of factors, such as whether there is any coerciveness on the part of the police, whether the exchange is cooperative in nature, and whether the defendant had everything he reasonably required to proceed on his journey. See White, 81 F.3d at 779. As the Supreme Court has instructed, our ultimate inquiry remains whether "a reasonable person would feel free to terminate the encounter." Drayton, 536 U.S. at 201, 122 S. Ct. at 2110; see also Bostick, 501 U.S. at 436, 111 S. Ct. at 2387.

Guided by that objective standard, we conclude that a reasonable person in Ramirez's circumstances would have felt free to terminate the encounter and to decline Corporal Martin's request for further information. This conclusion is based not only on the fact that Ramirez had received all of his documentation and thus had everything he needed to proceed on his way, but also that his follow-up discussion with Corporal Martin appears, from the videotape of the event, to have been fully cooperative and non-coercive. The fact that Ramirez opted to answer Corporal Martin's follow-up question, rather than voluntarily terminating the encounter, does not change our conclusion that the exchange had converted from a

20

traffic stop into a consensual encounter. Viewing the totality of the circumstances, we conclude that the post-citation discussion with Corporal Martin was consensual in nature, and that, as a result, Ramirez was not detained at the time he offered to have his car searched. Consequently, Ramirez's Fourth Amendment rights were not implicated by this encounter, and the district court properly denied his motion to suppress.

### III. CONCLUSION

Ramirez appealed the district court's denial of his motion to suppress evidence seized after a search of his car, contending that his authorization of the car search, the search, and the subsequent discovery of 7 kilograms of cocaine all should have been excluded as products of an unlawful detention. Because we conclude that a reasonable person in Ramirez's position would have felt free to terminate the encounter with Corporal Martin, we find that the post-citation encounter with Corporal Martin was consensual in nature, and that therefore Ramirez was not detained for purposes of the Fourth Amendment. Because there was no constitutional violation, the district court acted properly in denying Ramirez's motion to suppress. The judgment of the district court is **AFFIRMED.**