[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-13039
Non-Argument Calendar
_____

D.C. Docket No. 1:17-cr-00471-MHH-TMP-1

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

CANTRELL LAMONT BURWELL,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(February 27, 2019)

Before BRANCH, HULL and JULIE CARNES, Circuit Judges.

PER CURIAM:

The government appeals the district court's order granting defendant Cantrell Burwell's motion to suppress the drugs and firearm found in his vehicle during a traffic stop. The government seeks reversal of that order on the ground that the district court erred in concluding that Burwell's consent to search his vehicle was coerced and not voluntary. After careful review, we vacate the order granting Burwell's motion to suppress because we conclude that, at the time when Burwell consented to the search, he was engaged in a consensual encounter with the police officer, Burwell's consent was voluntarily given, and the police officer's search of his vehicle did not exceed the scope of his consent.

## I. BACKGROUND

### A. Traffic Stop and Search of Burwell's Vehicle

The material facts of this case are undisputed. On September 16, 2016, at approximately 2:46 a.m., Anniston City Police Officer Josh Powers pulled over a black Chevrolet Tahoe that Burwell was driving in Anniston, Alabama. Officer Powers wore a body camera, which recorded the traffic stop and his interactions with Burwell. All of the factual background here is based on the video and audio recordings on the body camera and Powers's testimony at the evidentiary hearing on the motion to suppress.[1]

---

[1]Burwell did not testify at that evidentiary hearing.

2

Powers parked his patrol car behind the Tahoe, which Burwell had stopped in a parking lot. Powers got out of his car, approached the Tahoe on the driver's side, and told Burwell that he pulled him over for failing to maintain his lane. Burwell handed Powers his driver's license, registration, and proof of insurance. From his license, Powers noted that Burwell lived in Toney, Alabama, and Burwell told the officer where within Alabama Toney was located. Burwell volunteered to Powers that he and his passenger, Kelly Boucher, had been fishing at his buddy's house. In a friendly tone, Powers asked if they had caught any fish, and Burwell said they had not. Powers asked a few follow-up questions about their fishing trip and learned that Burwell and Boucher were on their way home after fishing that day at a friend's pond in LaGrange, Georgia. Boucher also gave Powers her driver's license.

Powers then went back to his patrol car to determine whether Burwell or Boucher had any outstanding warrants. Neither did. Powers also called for backup and another Anniston Police Officer, Officer Collins, arrived to assist about five minutes later. Powers told Collins that Burwell had prior drug possession convictions and seemed "real nervous." Powers explained to Collins that Burwell's fishing story was suspicious and questioned why Burwell and Boucher would drive from Toney, Alabama, which is near Tennessee, all the way to LaGrange, Georgia to fish in someone's pond and return in the middle of the night.

3

Powers also told Collins that when he ran Burwell's insurance through their system, it came back unconfirmed, but that did not justify him towing the Tahoe for lack of insurance.

Nevertheless, Powers said he was going to "try to get in that car." Powers continued, "I'm gonna get him out and explain to him I'm going to write him a warning and try to sweet talk my way in."[2] Powers repeated that he doubted Burwell's fishing story because they were returning at 2:30 a.m. and, while they had fishing poles in the vehicle, they had no cooler. Powers also questioned Burwell's choice of route, suggesting that he should have stayed on the interstate. Officer Collins responded that Burwell could have been driving that particular route to avoid "the gauntlet," a stretch of I-20 with a heavy presence of law enforcement. Powers then said, "God, I wish we had a dog. Here we go. Let's try it."

Powers walked back to the Tahoe and told Burwell that he was going to give him a warning for his improper lane usage. Powers asked Burwell to step out of the car so that he could explain the warning. Burwell said "alright," and Powers asked if he had any weapons on his person. Burwell answered no. Powers then

---

[2]At the suppression hearing, Powers testified that, by "sweet talk," he meant asking questions in order to de-escalate the situation. He explained that police officers are trained to de-escalate during roadside interviews because everyone is nervous when pulled over by the police. Also, in answering questions from the district court, Powers admitted that by de-escalating the situation, he tries to put individuals at ease so that they will cooperate and voluntarily consent to him conducting various searches.

patted him down and found none.  After Burwell gave Powers permission to search

his pockets, Powers discovered about $600 in cash in Burwell's front pocket.

Burwell told Powers that he earned the money from work.

Both men walked back to the patrol car so that Powers could explain the

warning to Burwell.  Powers said that he was "giv[ing] him a warning [for failure

to maintain lane]—I know it's late."  Burwell thanked Powers.  Powers then began

to fill out the warning paperwork, first verifying that the address listed on

Burwell's license was correct.  While writing out the warning, Powers asked

Burwell additional questions about the fishing trip, including why he decided to

drive back to Alabama in the middle of the night, his relationship with Boucher,

and where she lived.  Burwell answered all of Powers questions, explaining that he

and Boucher had planned to stay the night in LaGrange, but instead left because

Boucher needed to get home to Alabama to take care of her son.

After finishing the paperwork, Powers returned Burwell's and Boucher's

driver's licenses.  Powers joked about the number of times he accidentally kept

someone's license.  Burwell said that had actually happened to him before—that an

officer accidently kept his driver's license.  Powers then said, "all right man, here's

that warning.  Like I said, that's for when I had you pulled over, you were

swerving a little bit, not terrible but you come over on that fog line a couple times.

So I was just making sure you was alright."  Powers handed Burwell the warning

and said, "there's that back." This part of the traffic stop lasted 16 minutes and 9 seconds.

With the warning and licenses in hand, Burwell turned and began to walk towards his car, but Powers said, "hey before you go, you care if I ask you a few more questions?" Burwell responded "sure." Powers said, "all right, man. Our boss has been on us pretty bad about being productive and trying to, you know, do work—they like to see us out here working. Part of our job is to, you know, find drugs, large amounts of money, firearms, anything—stuff like that. You don't have anything like that in the car do you?"

Burwell responded, "no sir, you can check." Powers then confirmed that he had Burwell's consent to search his vehicle: "You don't care if I search it real quick?" Burwell again gave consent. This exchange about the consent lasted approximately 25 seconds.

At that point, Powers returned to the Tahoe and Burwell stayed back by the patrol car. After having Boucher exit the car, Powers searched the passenger compartment of the vehicle for about 11 minutes. Powers then opened the vehicle's hood and looked in the engine compartment. He found a handgun and approximately 55 grams of methamphetamine partially hidden under the fuse box in the engine. Powers arrested Burwell, who admitted that the gun and drugs belonged to him.

6

Thereafter, Burwell was charged with possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

## B. District Court Suppresses the Evidence

Burwell moved to suppress the evidence against him on the ground that his consent to search the vehicle did not permit Powers to open the vehicle's hood and search the engine compartment. In his reply brief, Burwell argued further that the traffic stop was completed before Powers asked about contraband and requested consent to search his vehicle. As such, Burwell contended that Powers was not justified in detaining him to ask to search his car.

Following a hearing on the motion, during which Powers testified, the district court granted Burwell's motion to suppress on a different ground—that Burwell's consent to the search was coerced. To reach this conclusion, the district court first determined that the traffic stop was completed before Powers asked to search Burwell's car because Powers returned Burwell's driver's license, explained the warning to him, and handed him the written warning.

After the traffic stop ended, the court found that Burwell's interaction with Powers was not a consensual encounter because Powers coerced him into

cooperating with "sweet talk." Specifically, the court explained that Powers used a friendly tone and joked with Burwell to exert a subtle form of pressure—the pressure of a debt that Powers created by letting Burwell off with a warning instead of a citation, which made Burwell feel compelled to oblige the officer's requests. According to the court, Powers then asked for a favor in return for the warning, that is Burwell's permission to search the vehicle, which would make Powers look good to his boss. "Because Officer Powers used coercive tactics to try to trick Mr. Burwell into giving consent, and because Officer Powers did not tell Mr. Burwell that the traffic stop was over or that he was free to leave without consenting to the search, the [c]ourt does not find that Mr. Burwell's consent was voluntary." With no valid consent, the court concluded that the search of Burwell's vehicle violated the Fourth Amendment.

This is the government's appeal. Among other things, the government argues that the district court erred in granting the motion to suppress because: (1) at the time that Powers asked for consent to search Burwell's vehicle, the stop had become a consensual encounter; (2) Burwell's consent to search was voluntary; and (3) Powers did not exceed the scope of Burwell's consent by searching under the vehicle's hood. In his response, Burwell argues for the first time that Powers unlawfully prolonged the traffic stop before he gave Burwell the

written warning by taking actions aimed at discovering general criminal activity unrelated to the traffic stop. We address each argument in turn.

## II. DISCUSSION

### A. Standard of Review

"A denial of a motion to suppress involves mixed questions of fact and law. We review factual findings for clear error and view the evidence in the light most favorable to the prevailing party. We review de novo the application of the law to the facts." United States v. Barber, 777 F.3d 1303, 1304 (11th Cir. 2015) (citations omitted).

### B. Consensual Encounter

On appeal, the government first argues that at the time when Powers asked Burwell for consent to search the vehicle, the traffic stop had become a consensual encounter. Because Burwell was not detained when he gave consent to search, the government asserts that his Fourth Amendment rights were not implicated. We find this argument persuasive.

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV. A routine traffic stop is a limited form of seizure that is more analogous to an investigative detention than a custodial arrest, and so we analyze the legality of such stops under the standard articulated in Terry v.

Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968). United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). "Under Terry, an officer's actions during a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place." Id. (internal quotation marks omitted).

Moreover, "the duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop." Id. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez v. United States, 575 U.S. __, 135 S. Ct. 1609, 1614 (2015). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." Id. (internal citation omitted). That mission or purpose often includes checking the driver's license, attending to safety concerns, searching for outstanding warrants against the driver, and inspecting the vehicle's registration and proof of insurance. Id. at __,135 S. Ct. at 1615. But "unrelated inquiries" that "measurably extend the duration of the stop" offend the Constitution. Id.

The Fourth Amendment allows lengthening the traffic stop for unrelated inquiries in only two situations. United States v. Ramirez, 476 F.3d 1231, 1237 (11th Cir. 2007).

> First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion

10

illegal activity has occurred or is occurring.    Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter.

United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999).  Although there is no bright-line test for determining whether a traffic stop is a seizure or a consensual encounter, we examine the totality of the circumstances, including whether there is any police coercion, whether the exchange is cooperative in nature, and whether the defendant had everything reasonably required to leave.  Ramirez, 476 F.3d at 1240.  We also may consider the following factors in determining whether a police-citizen encounter was consensual:

> whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.

United States v. Jordan, 635 F.3d 1181, 1186 (11th Cir. 2011) (internal quotation marks omitted).

The Supreme Court has instructed that the ultimate, objective inquiry remains whether "a reasonable person would feel free to terminate the encounter." United States v. Drayton, 536 U.S. 194, 201, 122 S. Ct. 2105, 2110 (2002). Therefore, where a reasonable person would feel free to decline the requests of law enforcement or otherwise terminate the encounter, the encounter is consensual, and the Fourth Amendment is not implicated.  Ramirez, 476 F.3d at 1238.

11

In Ramirez, a case similar to this one, we rejected the defendant Ramirez's assertion that additional questioning by police constituted an illegal prolonging of his detention during a traffic stop.  Id. at 1236.  In that case, after the police officer returned Ramirez's license, handed him the traffic citation, and told him the traffic stop was over, the officer asked the defendant if he was carrying anything illegal in his car.  Id. at 1234.  Ramirez responded by advising the police officer that he could search the vehicle if he wanted to.  Id.  After some additional discussion, Ramirez signed a consent form.  Id. at 1234-35.  The officer then searched the vehicle and found cocaine.  Id.

On appeal, we concluded that Ramirez's Fourth Amendment challenge to the traffic stop was meritless because, after the police officer returned Ramirez's license and gave him the traffic citation, the stop became a consensual encounter. Id. at 1241.  In so ruling, we explained that when the officer asked the post-citation question about contraband in Ramirez's car, "all business with [Ramirez] was completed and [] he was free to leave."  Id. at 1240 (internal quotation marks omitted).  We also said that Ramirez's post-citation discussion with the officer appeared to be fully cooperative and non-coercive.  Id.  For those reasons, we concluded that a reasonable person in Ramirez's position would have felt free to terminate the encounter with the police officer and thus the encounter was consensual.  Id. at 1241.

12

In this case, like in <u>Ramirez</u>, the traffic stop ended when Powers returned Burwell's and Boucher's licenses, explained the warning to Burwell, and gave him the written warning. As Burwell then turned to walk to his car, Powers asked if Burwell would mind answering additional questions. Burwell responded "sure." At that point, "the exchange [became] cooperative in nature" because Burwell "had everything he reasonably required to proceed on his journey" but voluntarily agreed to answer Powers's additional questions instead of ending the encounter. See <u>id.</u> at 1240. That Burwell chose to answer the follow-up questions instead of terminating the encounter does not change the fact that it had converted from a traffic stop into a consensual encounter. <u>Id.</u>

Contrary to Burwell's argument on appeal, Powers was not required to inform him that the traffic stop was over or that he was free to go for the encounter to be consensual. See <u>Ohio v. Robinette</u>, 519 U.S. 33, 35, 117 S. Ct. 417, 419 (1996) (holding that the Fourth Amendment does not require that a lawfully seized defendant must be advised that he is "free to go" before his consent to search will be recognized as voluntary). In any event, Powers's question itself—"hey before you go, you care if I ask you a few more questions?"—indicated to Burwell that the traffic stop was over and staying to answer additional questions was optional. Moreover, at that time, Burwell was not impeded, touched, or threatened by Powers, their interactions appeared to be fully cooperative, Powers's gun remained

13

holstered, and Powers used the same friendly tone that he had used during the entire traffic stop.  See Jordan, 635 F.3d at 1186.  We know all this because the video camera tells us so.

Under these particular undisputed factual circumstances, we conclude that a reasonable person in Burwell's position would have felt free to leave when Powers asked Burwell for permission to question him further.  Therefore, at that point, the encounter was consensual, and the Fourth Amendment was not implicated.  See Ramirez, 476 F.3d at 1238.  The district court erred in concluding otherwise.

## C.  Voluntary Consent

The government next argues that the district court erred in determining that Burwell's consent to search the vehicle was coerced by Powers's "sweet talk." Instead, the government maintains that Burwell voluntarily consented to the search, pointing out that Burwell offered to let Powers search the car before Powers even asked.  We agree.

Voluntariness is a question of fact that we may disturb only if clearly erroneous.  United States v. Spivey, 861 F.3d 1207, 1212 (11th Cir. 2017). "Normally, we will accord the district judge a great deal of deference regarding a finding of voluntariness, and we will disturb the ruling only if we are left with the definite and firm conviction that the trial judge erred."  United States v. Fernandez, 58 F.3d 593, 596–97 (11th Cir. 1995) (internal quotation marks omitted).

14

However, whereas here, the district court applied the law about voluntariness to the uncontested facts, our review is de novo.  See Spivey, 861 F.3d at 1212.

An officer conducting a routine traffic stop may request consent to search the vehicle.  Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S. Ct. 2041, 2045 (1973).  A consensual search is constitutional if it is voluntary; if it is the product of an "essentially free and unconstrained choice."  Schneckloth, 412 U.S. at 225, 93 S. Ct. at 2046.  Voluntariness is "not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis" that is based on "the totality of the circumstances."  United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989).  "Relevant factors include the voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found."  Spivey, 861 F.3d at 1213 (internal quotation marks omitted).  The government bears the burden of proving the voluntariness of the consent.  United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984).

In this case, the district court erred in finding that Burwell did not voluntarily consent to the search of his vehicle because the record does not support that finding.  First, Burwell was not seized, handcuffed, or in custody at the time he

15

gave consent; rather, his encounter with Powers was consensual.  See United States v. Hall, 565 F.2d 917, 920 (5th Cir. 1978) ("It is generally recognized that coercion is more easily found if the person consenting to the search has been placed under arrest[.]").  Indeed, after getting Burwell's permission to continue the encounter, Powers said, "all right, man.  Our boss has been on us pretty bad about being productive and trying to, you know, do work—they like to see us out here working.  Part of our job is to, you know, find drugs, large amounts of money, firearms, anything—stuff like that.  You don't have anything like that in the car do you?"  In response, Burwell denied having contraband in his car and offered his consent to search the vehicle before Powers even asked for it, saying: "no sir, you can check."  Powers then verbally confirmed that he had Burwell's consent to search the vehicle.  And Burwell gave consent a second time.

The record, therefore, shows that Burwell, an adult with no apparent intellectual difficulties, offered to let Powers search his vehicle before Powers even asked and gave his consent to the search twice.  Moreover, Burwell had been fully cooperative with Powers during their entire exchange.  In fact, by the time that Burwell volunteered to let Powers search his vehicle, Burwell had already agreed to cooperate with Powers in two separate instances—first when allowing Powers to search his pockets and then in agreeing to answer his questions.  In addition, the video and audio record shows that Powers and Burwell spoke in a friendly tone

16

and even joked with each other.  While Powers did not inform Burwell that he had the right to refuse consent, he was not required to do so.  See Schneckloth, 412 U.S. at 248-49, 93 S. Ct. at 2058-59.

The district court concluded otherwise because it determined that Powers engaged in what it deemed the coercive technique of using "sweet talk." According to the district court, Powers coerced Burwell by using a friendly tone to exert pressure, by first letting Burwell off with a warning, second, cementing good will with jokes, and then third asking Burwell for a favor in return, "a quid pro quo," that is consent to search his vehicle so that Powers looked good for his boss. While police coercion is one factor a court may consider in determining whether a consent is voluntary, we find no trace of such coercion in the record before us.

Indeed, there is no evidence of any inherently coercive tactics, either from the nature of Powers's questioning or the environment in which it took place. Rather, the encounter was "polite and cooperative," and Powers "used no signs of force, physical coercion, or threats."  Spivey, 861 F.3d at 1216.  Nothing in the video and audio record shows that Powers lied, deceived, or tricked Burwell—tactics we have suggested may constitute psychological coercion in the context of consent for a search.  See id. at 1214.

Importantly too, in the district court Burwell did not testify or even argue that he believed that Powers induced his consent by letting him off with a warning

17

and then requesting to search his vehicle in return for that favor. And although the district court found a quid pro quo in that arrangement, nothing that Powers said to Burwell at the time expressed or implied that the warning might turn into a ticket if Burwell did not consent to the search.

We recognize too that police officers routinely give drivers warnings rather than issue traffic citations, and they are trained to engage with drivers in a friendly tone to de-escalate the situation. There is nothing inherently coercive about that. And Powers's statement about his boss wanting him to be productive is not inherently coercive because, even if it was not true, there is no evidence that Powers's statement led Burwell to believe he could not refuse to consent. Moreover, Powers expressly told Burwell that he was looking for drugs and firearms, which was in fact the case, so we see no trickery or deception in that statement either.

It appears to us that the district court's own conclusion that Powers coerced Burwell's consent through the use of "sweet talk" to "get into [Burwell's] car" was largely based on Powers's own statements to Officer Collins at the scene that he was going to try to "sweet talk his way in" to the vehicle.[3] However, the

_____

[3]The district court also relied on Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966), in concluding that Powers's conduct violated the Constitution. In doing so, the district court stated that "the Fifth Amendment right to remain silent and avoid self-incrimination is, in many respects, similar to the Fourth Amendment right to walk away from a law enforcement officer at the conclusion of a lawful traffic stop." However, the Supreme Court has made clear that "[t]here is a vast difference between those rights" in the Fifth and Fourth Amendments and

18

subjective motivation of police officers is irrelevant in determining whether a consent is voluntary. Spivey, 861 F.3d at 1215. We have made plain that "[c]onsent is about what the suspect knows and does, not what the police intend" because "[c]oercion is determined from the perspective of the suspect." Id. (internal quotation marks omitted). Even if a police officer deliberately lies to a suspect, that does not matter because the "only relevant state of mind" for voluntariness "is that of [the suspect] himself." United States v. Farley, 607 F.3d 1294, 1330 (11th Cir. 2010). Accordingly, Powers's subjective purpose for his friendly tone, letting Burwell off with a warning, and then asking to search Burwell's vehicle due to pressure from his boss does not affect the voluntariness of Burwell's consent. See Spivey, 861 F.3d at 1215; Whren v. United States, 517 U.S. 806, 812-13, 116 S. Ct. 1769, 1774 (1996).

In sum, under the totality of the undisputed circumstances, we conclude that the government has shown that Burwell's consent to search the vehicle was voluntary and uncontaminated by coercion. Accordingly, the district court erred in

---

that the "considerations that informed the Court's holding in Miranda are simply inapplicable" in a consent to search case. Schneckloth, 412 U.S. at 241-47, 93 S. Ct. at 2055-58. We also note that the tactic of an officer showing himself to be "a kindhearted man" discussed in Miranda had to do with a ploy set forth in police manuals "termed the 'friendly-unfriendly' or the 'Mutt and Jeff' act," where two officers play good-cop, bad-cop to extract a confession from a suspect. Miranda, 348 U.S. at 452, 86 S. Ct. at 1616. There is no evidence that Powers engaged in that ploy here.

concluding that Burwell's consent was coerced and granting the motion to suppress.

## D.  Scope of Burwell's Consent

The government also argues that, although the district court did not address the issue, Powers did not exceed the scope of Burwell's consent by looking under the vehicle's hood into the engine compartment because Burwell's consent was general, and there was a reasonable chance that Powers might find guns or drugs in the engine compartment.  Burwell responds that we should remand this issue to the district court to determine in the first instance whether Powers's search exceeded the scope of the consent.

It is true that where the district court did not address a party's argument and a determination of that issue is fact-specific, we may remand to the district court to address the issue in the first instance.  See Torres v. Pittston Co., 346 F.3d 1324, 1334 (11th Cir. 2003).  However, a federal appellate court is justified in resolving an issue not passed on below where the proper resolution is beyond any doubt.  Narey v. Dean, 32 F.3d 1521, 1526-27 (11th Cir. 1994).  Because the facts of this case are undisputed and the proper resolution of this issue is beyond a reasonable doubt, we will exercise our discretion and resolve the issue here.

"[A] search is impermissible when an officer does not conform to the limitations imposed by the person giving consent."  United States v. Zapata, 180

F.3d 1237, 1242 (11th Cir. 1999). "A general consent to search for specific items includes consent to search any compartment or container that might reasonably contain those items." Id. at 1243. "When an individual provides a general consent to search, without expressly limiting the terms of his consent, the search is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass." Id. at 1242 (internal quotation marks omitted). "While we have held that a search exceeds the scope of consent when an officer destroys a vehicle, its parts, or its contents, a search does not exceed the scope of consent merely because an officer forces open a secured compartment that reasonably may contain the objects of the search." Id. at 1243 (internal citation omitted) (distinguishing a valid search of an interior door panel from an invalid search during which an officer slashed open a spare tire). The person who gave consent can also limit the scope of a search as it is occurring or request that it be discontinued. See United States v. Harris, 928 F.2d 1113, 1117-18 (11th Cir. 1991).

In this case, Powers informed Burwell that he was searching for drugs, large amounts of money, and firearms, which Powers knew were sometimes hidden under a vehicle's hood in the engine compartment. Burwell did not put any limitations on his consent to search the vehicle, he did not object when Powers started looking under the hood of the car, and Powers did not damage the vehicle

21

in any way when he looked under the hood.  Accordingly, Powers did not exceed

the scope of Burwell's consent to search.  See Zapata, 180 F.3d at 1242-43; Harris,

928 F.2d at 1117-18.

## E.  Burwell's Alternative Reason to Affirm

On appeal, Burwell asks us to affirm the district court's suppression order

for an alternative reason not addressed by the court below.  He now argues that

Powers took steps that unlawfully prolonged the traffic stop so that he could

inquire into general criminal conduct before issuing the written warning.

Specifically, Burwell challenges these four actions taken by Powers before he

completed the written warning: (1) calling and waiting for backup; (2) explaining

the situation to Officer Collins when he arrived, including his suspicion of general

criminal activity; (3) asking Burwell to step out of the vehicle and patting him

down; and (4) asking Burwell additional questions about the fishing trip and his

travel plans while filling out the written warning.[4]

We have discretion to affirm a district court's ruling on a motion to suppress

on alternative grounds when the record below supports that reason, even if not

---

[4]We note that at the suppression hearing, Burwell briefly argued that the questions that
Powers asked him while writing out the warning citation were not related to the mission of the
traffic stop, but his briefing on the motion to suppress did not include any argument that Powers
unlawfully prolonged the traffic stop before giving him the warning.  In the district court,
Burwell also never argued at all that Powers unlawfully extended the traffic stop by calling for
back up, discussing the situation with Collins, or having Burwell exit the vehicle and patting him
down.

relied upon by the district court.  United States v. Caraballo, 595 F.3d 1214, 1222 (11th Cir. 2010).  We decline to exercise our discretion to do so here.

Alternatively, even if we consider Burwell's new arguments, we conclude that the record shows that Powers's conduct fell within the lawful purpose of the traffic stop and did not unlawfully prolong the stop before he issued the warning citation.  As we explained above, the duration of a traffic stop must be limited to the time necessary to effectuate the purpose of the stop.  The purpose of a traffic stop includes determining whether to issue a traffic citation, checking the driver's license, searching for outstanding warrants against the driver, and inspecting the vehicle's registration and proof of insurance.  Rodriguez, 575 U.S. at __, 135 S. Ct. at 1615.  These tasks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.  Id.  In addition, "[g]enerally, questions about travel plans are ordinary inquiries incident to a traffic stop."  United States v. Campbell, 912 F.3d 1340, 1354 (11th Cir. 2019).

The purpose of a traffic stop also includes attending to any related safety concerns, including "the government's officer safety interest [that] stems from the mission of the stop itself."  Rodriguez, 575 U.S. at __, 135 S. Ct. at 1616.  "Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general or drug trafficking in particular."  Id.  The

23

Supreme Court has repeatedly recognized that traffic stops are "'especially fraught with dangers to police officers.'" Rodriguez, 575 U.S. at __, 135 S. Ct. at 1616 (quoting Arizona v. Johnson, 555 U.S. 323, 330, 129 S. Ct. 781, 782 (2009)); see also Pennsylvania v. Mimms, 434 U.S. 106, 110, 98 S. Ct. 330, 333 (1977) (explaining that "a significant percentage of murders of police officers occurs when the officers are making traffic stops"). Therefore, "an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." Rodriguez, 575 U.S. at __, 135 S. Ct. at 1616. In that vein, it is well-settled that an officer may direct a driver to get out of the car during a lawful traffic stop. See Mimms, 434 U.S. at 111 n.6, 98 S. Ct. at 333 n.6 ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment[.]"). Moreover, once that driver is outside a stopped vehicle, he may be patted down for weapons if the officer has reason to believe that his own safety or the safety of others is at risk. Id. at 112, 98 S. Ct. at 334; United States v. White, 593 F.3d 1199, 1202 (11th Cir. 2010). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." White, 593 F.3d at 1202-03 (internal quotation marks omitted).

24

Given this precedent, we conclude that Powers's conduct—of calling for back up, briefing Officer Collins on the situation when he arrived, directing Burwell out of his vehicle, and patting him down—was related to the mission of the traffic stop, that is, ensuring officer safety. Because Powers's actions in this regard related to safety concerns, the delays they caused are the sort of "negligibly burdensome precautions" tolerated by the Fourth Amendment. See Rodriguez, 575 U.S. at __, 135 S. Ct. at 1616.[5]

Indeed, Powers's safety concerns were objectively strong. The traffic stop took place at 2:46 a.m. at a location with little other traffic. Two individuals were in the stopped vehicle, but Powers was alone. The driver, Burwell, appeared to be very nervous, he had prior drug convictions, and provided an unusual explanation for where he had been, namely, that earlier in the evening, he had driven several hours to Georgia to fish in a pond and decided to drive back to Alabama in the middle of the night. Further, Powers found it suspicious that Burwell was not driving on the interstate. In Powers's experience, individuals transporting drugs often avoid that section of interstate that he referred to as the "gauntlet," which was known to have a heavy law-enforcement presence. Based on Burwell's prior drug

---

[5]Our conclusion remains the same even considering that Powers testified at the suppression hearing that one reason why he called for backup and was interested in Burwell's fishing story was because he thought something was up and he wanted to investigate it further. We do not consider an officer's subjective motivations in this area of the law. See Whren, 517 U.S. at 812-13, 116 S. Ct. at 1774.

convictions, Powers also was concerned that he might have a firearm because "if you find drugs, you are going to find weapons."

We also readily conclude that Powers's general questions at 2:46 a.m. about Burwell's fishing trip and travel itinerary, including his destination, route, and reasons for driving at that time of night, were ordinary inquiries incident to a traffic stop. In particular, all of Powers's questions were reasonably related to ascertaining why Burwell had been swerving and failed to maintain his lane and whether he posed a danger to others on the road given where he still had to drive that night. As such, asking about Burwell's travel plans was related to investigating his failure to maintain his lane while driving.

Importantly, Powers's conduct before issuing the warning citation did not include inquiries that were unrelated to a traffic stop's purpose and instead aimed at investigating other crimes. In Rodriguez, the Supreme Court made clear that "unrelated inquiries" aimed to detect general criminal activity that "measurably extend the duration of the stop" offend the Constitution, even if de minimis. Id. at __, 135 S. Ct. at 1614-16. [6] In Johnson, for instance, the Court intimated that asking about a passenger's gang affiliation is not an inquiry related to a traffic stop.

---

[6]Nonetheless, inquiries into matters unrelated to the purpose of the traffic stop are permissible so long as they do not prolong the stop. Id. at 1614–15; see also Johnson, 555 U.S. at 327-38, 129 S. Ct. at 787-88 (concluding that the Fourth Amendment tolerated the unrelated investigation into the passenger's gang affiliation that did not lengthen the duration of the roadside detention).

See <u>Johnson</u>, 555 U.S. at 332-33, 129 S. Ct. at 787-78.  And in <u>Rodriguez</u>, the

Supreme Court held that using a dog to sniff for contraband is not related to the

purpose of a traffic stop and instead aimed at detecting ordinary criminal

wrongdoing.  <u>Rodriguez</u>, 575 U.S. at __, 135 S. Ct. at 1615.

Here, Powers did not use a drug dog or ask about Burwell's gang affiliation

during the traffic stop.  Instead the four actions Powers took prior to issuing the

written warning were related to the purpose of the traffic stop and thus did not

unlawfully prolong it.

## F.  <u>United States v. Campbell</u>

Finally, Burwell has filed supplemental authority following this Court's

recent decision in <u>United States v. Campbell</u>, 912 F.3d 1340 (11th Cir. 2019),

which he claims "makes absolutely clear that Officer Powers violated the Fourth

Amendment."

In <u>Campbell</u>, we applied <u>Rodriguez</u> to hold that a traffic stop was unlawful

because it had been prolonged for 25 seconds by an officer's efforts to uncover

evidence of general criminal activity unrelated to the purpose of the stop.  <u>Id.</u>

at 1354-55.  There, an officer pulled over a vehicle after witnessing two potential

traffic violations and began issuing a written warning.  <u>Id.</u> at 1344-45.  As the

officer filled out the warning, he asked the driver whether he had any contraband in

his vehicle, such as counterfeit merchandise, illegal alcohol, drugs, or any dead

bodies. Id. at 1345. The driver said that he did not and gave the officer permission to search his vehicle, and the officer found a firearm and ski mask. Id. The driver sought suppression of that evidence on the basis that the officer unlawfully prolonged the stop by asking questions designed to investigate general criminal activity. Id. On appeal, we agreed that the stop was unlawful under Rodriguez because it had been prolonged by the officer's questions about the contraband, which were unrelated to the purpose of the traffic stop. Id. at 1354-55. But we declined to invoke the exclusionary rule, finding that the good faith-exception applied. Id. at 1355-56.

Campbell is materially distinguishable from this case for two reasons. First, in Campbell, the officer asked the driver questions about contraband while filling out the warning citation, that is, during the traffic stop. Id. at 1344-45. In contrast here, Powers did not ask Burwell whether he had any contraband in his vehicle until after the traffic stop was finished and had converted into a consensual encounter. The Fourth Amendment is not implicated during a consensual encounter. See Pruitt, 174 F.3d at 1220.

Second, although Powers did ask Burwell questions while simultaneously filling out the written warning, the questions Powers asked concerned Burwell's travel plans and were reasonably related to the purpose of the traffic stop. In fact, in Campbell, we expressly found that "questions about travel plans are ordinary

28

inquiries incident to a traffic stop." Id. at 1354.  On the other hand, the unlawful questions posed by the officer in Campbell concerned contraband possession and related solely to investigating general criminal activity.  Therefore, Burwell's reliance on Campbell is unpersuasive.

## III.  CONCLUSION

After careful review of the uncontroverted facts established in the record, we conclude that the conditions which existed at the time Burwell consented to allow Powers to search his vehicle do not support the district court's finding that his consent was coerced and could not have been voluntary.  We also conclude that Powers's search of the vehicle did not exceed the scope of Burwell's consent.  Finally, we decline to affirm the district court's suppression order for the alternative reason Burwell now advances on appeal.  Accordingly, we reverse the district court's order granting Burwell's motion to suppress and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**